AERO–MOTIVE COMPANY, Plaintiff,

v.

U.S. AEROMOTIVE, INC., Defendant.

No. 4:94–CV–175.

United States District Court,
W.D. Michigan,
Southern Division.

March 22, 1996.

David G. Boutell, Flynn, Thiel, Boutell & Tanis, Kalamazoo, MI, James J. Hill, Emrich & Dithmar, Chicago, IL, for plaintiff.

Randall G. Litton, Price, Heneveld, Cooper, Dewitt, et al., Grand Rapids, MI, for defendant.

### OPINION

QUIST, District Judge.

This is an action by Aero–Motive Company against U.S. Aeromotive, Inc. for false designation of origin, trade name, and service mark infringement and dilution of trade name under the Trademark (Lanham) Act of 1946, as amended, 15 U.S.C. §§ 1051, *et seq.,* and for unfair competition under the common law of Michigan. Count IV of the complaint seeks injunctive relief for dilution of plaintiff's trade name under Michigan common law. The plaintiff does not pursue an award of monetary damages in this action.

### Facts

Plaintiff Aero–Motive Company is a Michigan corporation with its principal manufacturing facilities in Kalamazoo, Michigan. Aero–Motive employs approximately 200 people in the manufacture and sale of its products. Aero–Motive distributes its products throughout the United States through a network of manufacturers, representatives, and dealers. Plaintiff also has direct sales representatives for larger customers. Plaintiff's sales range in the tens of millions of dollars

annually. (*E.g.*, Exhibit 62.) Plaintiff also allocates a substantial amount of money on an annual basis for advertising its products. (*See* Exhibit AE.)

Plaintiff began its business in 1939 and has continuously used "Aero–Motive" as a part of its corporate name. Plaintiff first registered the trademark "Aero–Motive" in 1947. Plaintiff began as a contract manufacturer, or "job shop." In or around 1957, plaintiff ceased to be a job shop, preferring to manufacture products of its own design.

Plaintiff updated its original registered mark when it obtained a federal registration number 838,729 in 1967 for the following products: cord reel, cable reels, hose reels, balance reels, spring motors, and self-propelled carriers for applying tension to elongated flexible elements, such as cable hoses, and power transmission lines. Plaintiff registered a second trademark, number 1,500,-216, in 1988 for the mark "Aero–Motive" as applied to industrial mechanical manipulators and articulating balance arms. Both registered trademarks are incontestable.

Defendant, U.S. Aeromotive, Inc., is an Ohio corporation having its principal place of business in Dayton, Ohio. Defendant is engaged in the contract manufacturing business. It machines and assembles components utilized in the manufacture of automobiles and aircraft to customers' designs and specifications. Defendant has no significant product line of its own. Defendant also produces minority-owned business Department of Defense ground support equipment.

Defendant began its business in 1976 under the corporate name "Tape Tech, Inc." In 1985, Suhas Kakde, the current president of U.S. Aeromotive, joined the company as part owner. In 1991, defendant changed its name, following an employee contest, to its present name in order to acquire a name which more accurately described its actual business. The name, "U.S. Aeromotive, Inc.," was submitted for a clearance search to the Dayton, Ohio, intellectual property firm of Killworth, Gottman, Hagan and Schaeff, which rendered an opinion clearing the name for use by defendant in a letter dated July 10, 1991. Defendant's sales have totaled more than $5 million annually for the past decade. (Exhibit 8.)

On August 23, 1991, defendant, through the Killworth law firm, filed an intent to use trademark registration application in the U.S. Patent and Trademark Office, attempting to register the mark "U.S. Aeromotive." Plaintiff first became aware of defendant's application when it was published for opposition in the Official Gazette of the U.S. Patent and Trademark Office on March 22, 1994. Immediately upon learning of defendant's application, plaintiff filed an opposition in the Patent and Trademark Office. The opposition has been suspended because of the instant case.

## Discussion

### I. Plaintiff's Standing

Where the public is confused about the origin of goods or services due to the use of another's trademark, the holder of the mark is injured because its reputation has been placed beyond its control. *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir.1988). Under federal law, proof of likelihood of confusion is all that is required to subject a trademark or trade name infringer to civil liability. *See* 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1).

Defendant argues that plaintiff lacks standing under Article III of the United States Constitution because plaintiff has failed to establish that it has suffered an actual, as opposed to an abstract, injury. Defendant argues that there has been no confusion between the litigants' products to date and that plaintiffs have only voiced a concern that there could be a confusion between the litigants' products at some point in the future as the two companies evolve.

Plaintiff, however, alleged in its Complaint that *at present* the public is likely to be confused as to the origin of services and products offered by the litigants due to defendant's use of plaintiff's trademark. (Complaint at ¶ 20.) Furthermore, while plaintiff has admitted that there is no evidence of actual confusion to date, plaintiff maintains that the strength of its mark and its similarity to defendant's mark is enough to create a

present likelihood of confusion between the companies. (Plaintiff's Post–Trial Brief at 2.) Thus, plaintiff has adequately and consistently alleged an actual injury. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990). As a result, plaintiff has standing under Article III to maintain its lawsuit.

## II. Likelihood of Confusion

 Count I of the Complaint is based upon 15 U.S.C. § 1114(1)(a). Count II of the Complaint is based upon 15 U.S.C. § 1125(a). "The test for unfair competition under § 1125(a) is identical to that for trademark infringement under 15 U.S.C. § 1114, whether there is a likelihood of confusion." *Chrysler Corp. v. Newfield Publications, Inc.,* 880 F.Supp. 504, 509 (E.D.Mich.1995). Under the "likelihood of confusion test," the same factors are considered under both statutes. *Wynn Oil Co. v. American Way Serv. Corp. (Wynn Oil II),* 943 F.2d 595, 604 (6th Cir. 1991). Count III of the Complaint is based upon the Michigan common law regarding trademark and trade name infringement. Furthermore, the likelihood of confusion standard applicable under 15 U.S.C. § 1125(a) is also the standard for infringement under the Michigan common law.[1] *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833 (6th Cir.1983).

 In the Sixth Circuit, eight factors must be considered when determining if there is a likelihood of confusion between trademarks: (1) the strength of plaintiff's mark; (2) the relatedness of the products or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care and sophistication; (7) the intent of the defendant in selecting its mark; and (8) the likelihood of expansion of the product lines using the mark. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1106 (6th Cir.1991); *Countrywide Funding Corp. v. Countrywide*

*Fin. Corp.,* 879 F.Supp. 771, 773 (W.D.Mich. 1994). While the determination of whether there is a likelihood of confusion is a mixed question of fact and law, the "determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Homeowners,* 931 F.2d at 1107.

There is no mathematical formula for weighing the evidence. A plaintiff need not prove all, or even most, of the above factors to recover for trademark infringement. *Wynn Oil Co. v. Thomas (Wynn Oil I),* 839 F.2d 1183, 1186 (6th Cir.1988). The analysis is intended to yield an answer to the ultimate question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group,* 931 F.2d at 1107.

### A. The Strength of Plaintiff's Mark

 The Sixth Circuit has held that a mark is considered strong "if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Homeowners,* 931 F.2d at 1107 (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985)). In short, the Sixth Circuit uses two factors when determining a mark's distinctiveness within the public marketplace, i.e., the strength of the mark: (1) the mark's inherent distinctiveness and (2) the mark's "acquired distinctiveness" (through advertising, reputation, and the like). *See Homeowners,* 931 F.2d at 1107; *cf. Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992) (calling a mark's acquired distinctiveness its "secondary meaning").

 A mark's inherent distinctiveness is usually classified according to one of five categories, in order of increasing protection

---

**1.** Plaintiff notes that the standard for trade name infringement is the same as for trademark infringement, except that to prove trademark infringement, one must make the additional showing that the mark has been used in connection with specific goods and as a designation of origin

for those goods. Because defendant occasionally uses its marks on its goods, such as the jet engine test stand, trademark confusion will be proven if a likelihood of confusion exists. (Exhibits 6, 18–20.).

accorded: (1) generic; (2) descriptive; (3) suggestive; (4) fanciful; and (5) arbitrary. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757. The Second Circuit has defined these terms as follows:

> A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of the goods...." Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement."

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 572 (2d .Cir.1993) (citations omitted). Generic marks receive no protection because they are not registrable as trademarks. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757. Marks classified as "descriptive" are not considered inherently distinctive and will not receive the protection of the Lanham Act unless the mark's holder proves that the mark has acquired a "secondary meaning" in the marketplace thereby making it distinctive. *Id.; see also* 1 J. McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 11.05[1] (3rd ed. 1993). The suggestive, fanciful, and arbitrary marks are considered inherently distinctive and therefore worthy of protection. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757.

■■■ In following the minority rule, the Sixth Circuit has held that an incontestable trademark is presumptively strong. *Wynn Oil II,* 943 F.2d at 600; *Wynn Oil I,* 839 F.2d 1183 (6th Cir.1988). A trademark is considered incontestable after it has been used for five consecutive years following federal registration. *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 820 (1st Cir.1987). The nature of this presumption may be better understood with reference to an Eleventh Circuit decision, which also followed the minority rule. The Eleventh Circuit held that incontestable marks are "presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter v. B & H Indus.,* 880 F.2d 322, 329 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). Furthermore, "[o]nce a mark has achieved 'incontestable' status, its validity *cannot* be challenged on the grounds that it is merely descriptive...." *Id.* at 328 (emphasis added). However, the presumption may be rebutted by demonstrating that the mark, while inherently distinctive, is nevertheless not distinctive in the marketplace due to certain acquired characteristics. For instance, the Sixth Circuit has held that "courts have found extensive third-party uses of a trademark to substantially weaken the strength of the mark." *Homeowners,* 931 F.2d at 1108. A successful rebuttal on the grounds of the mark's acquired meaning will strip a merely descriptive mark of the assumption that is has acquired a "secondary meaning" in the marketplace, which is the basis of its protection under the Lanham Act. Thus, if a successful rebuttal is made, the issue of the mark's inherent distinctiveness is reopened, because the court must decide to what degree a mark's inherent distinctiveness will render it worthy of protection.

■■■ A mark's status as incontestable is based on 15 U.S.C. § 1065, entitled "Incontestability of right to use mark under certain conditions." *Dieter,* 880 F.2d at 328 (a case arising under 15 U.S.C. § 1114). The incontestable provisions in the Lanham Act apply only to goods and services set forth in the mark's registration. 15 U.S.C. § 1065; *see S.C. Johnson & Son, Inc. v. Johnson,* 266 F.2d 129, 136 (6th Cir.1959), *cert. denied,* 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959) ("The right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto"). Thus, an incontestable mark is only presumptively strong with respect to the goods and services set forth in the mark's registration.

In the instant case, plaintiff initially registered its trademark, "Aero–Motive," in 1947. Since that date, plaintiff has used the trademark continuously. At present, plaintiff

owns two federal trademark registrations for "Aero–Motive." One trademark, number 838,729, was issued by the U.S. Patent and Trademark Office in 1967.[2] The other trademark, number 1,500,216, which was issued during 1988, is also for the mark "Aero–Motive."[3] Both registered trademarks are incontestable. (Plaintiff's Agreed Findings at 8, 9).

■ Defendant attempts to rebut the presumption of strength by alleging that extensive third-party usage of the mark has substantially weakened the mark. Defendant argues that thirty-five corporations mostly engaged in the automotive and/or aerospace fields use the name "aeromotive" or a close derivative thereof as part of their trade names. Defendant also maintains that nineteen other businesses, also mostly engaged in the automotive and/or aerospace fields, utilized the phonetic equivalent "airmotive" or a close derivative thereof. (*See* Exhibit AZ.)

Plaintiff contends that with the possible exception of "Vector Aeromotive Corporation," there was virtually no evidence of third-party usage of the term "Aero–Motive" in any of the industries at issue in the case. (*See* Exhibit AZ.) Thus, plaintiff contends that the presumption of strength has not been refuted.

■ This Court agrees with defendant's understanding of the law. Third-party usage of a trademark may weaken a mark, even if the mark is used with respect to different kinds of goods. *Homeowners,* 931 F.2d at 1108 (citing *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259–60 (5th Cir.1980) (mark not challenged with respect to the uses to which it had already been put)). However, the information provided by defendant regarding the third-party use of the marks is minimal at best. This Court knows nothing of the extensiveness of the third-party usage beyond the names on a list and a brief identification of the businesses. (Exhibit AZ.) Also, the information presented by the list

itself seemed to indicate that, other than the litigants, only Vector Aeromotive and possibly Aeromotive, Inc. are engaged in the manufacture of goods for the aerospace and/or automotive industries. This Court is therefore unable to determine if the third-party usage is of the type that would effectively weaken the strength of plaintiff's mark in the marketplace. As such, the presumption that plaintiff's mark is strong with respect to the products listed in its trademark registration has not been effectively rebutted.

■ With respect to products offered by plaintiff which do *not* appear in its trademark registrations, this Court finds that its mark is inherently descriptive. Because the term "aeromotive" is an intentional reference to the automotive and aerospace industries, it is clear that the term "Aeromotive" is neither arbitrary, fanciful, or generic. Categorizing the term as either suggestive or descriptive, however, is not an easy task. As noted in McCarthy, "[t]he exact position of the line between descriptive and suggestive marks is almost impossible to define in the abstract." 1 J. McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 11.20[3] (3rd ed. 1993). "A term is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of a good." 1 J. McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 11.21[1] (3rd ed. 1993). It was not blind chance that led both companies to adopt virtually the same name. Both parties chose a name that described the nature of their businesses, even if they chose their names nearly fifty years apart. "Aeromotive" is descriptive because it describes, in a general sense, the character of the products offered by its holder—products intended for use in either the aerospace or automotive industry. For example, Arthur Connolly, a manufacturing representative for aeromotive products, testified that his primary line of business was "aeromotives." (Trial Transcript ("Trans.") at 95.) In the instant case, a purchaser need not "extrapolate from the

---

**2.** The mark covers the following products: cord reel, cable reels, hose reels, balance reels, spring motors, and self-propelled carriers for applying tension to elongated flexible element, such as cable hoses, and power transmission lines.

**3.** This mark covers industrial mechanical manipulators and articulating balance arms.

word[ ] of the mark and use imagination to determine the nature of the goods marketed" under the mark. *See Blockbuster Enter. Group v. Laylco, Inc.,* 869 F.Supp. 505, 510 (E.D.Mich.1994) (holding that "Blockbuster" is suggestive).

A descriptive mark will only be protected if it has acquired a distinct secondary meaning in the marketplace. As such, this Court must determine if the plaintiff's mark has acquired a distinctive secondary meaning. At trial, Mr. Connolly testified that every single one of the 139 automotive manufacturing plants in lower Michigan and the adjacent six counties in Ohio have Aero–Motive products in their plants which bear the name "Aero–Motive" in large letters. (Trans. at 97–98.) Further, plaintiff has spent a substantial amount of money over the years advertising under its trademark within the industry, even if this figure is minuscule compared with the sums spent by a large company such as Xerox. (Exhibit AE.)

■ Defendant's evidence of third party usage, however, may weaken the mark with respect to goods outside "the uses to which plaintiff has already put its mark." *Amstar,* 615 F.2d at 260. As such, it will be considered in the context of whether plaintiff's mark has a distinctive secondary meaning beyond the products set forth in its registration. Due to plaintiff's decades of advertising and building its reputation, this Court finds that plaintiff has established a secondary meaning within the manufacturing sector of the aerospace and automotive industries. Thus, this Court holds that plaintiff's mark is presumptively strong with respect to the goods set forth in its registration and descriptive with secondary meaning, and therefore worthy of protection, with respect to the manufacturing sector of the aerospace and automotive industries. Plaintiff's mark is merely descriptive without secondary meaning with respect to the uses other than manufacturing products for the automotive and aerospace industries. Thus, for the purposes of this litigation, this factor favors plaintiff.

### B. *The Relatedness of the Products or Services Offered*

■ Where there is a direct competition between the products or services offered by the litigants, there is usually a likelihood of confusion if the marks are similar. *Homeowners,* 931 F.2d at 1108. Where the products or services are "somewhat related but not competitive," this factor is not very probative. *Id.* Finally, where products or services are totally unrelated, there is little chance that a likelihood of confusion will be found. *Id.*[4]

■ In the instant case, defendant argues that the products and services offered by the litigants are completely unrelated because defendant sells machined components to component buyer specialists in the automotive industry and fabricated metal component buyer specialists in the aerospace industry. Defendant also sells specifically tailored items to the Department of Defense under Section 8 contracts, which are awarded solely to minority-owned businesses. Defendant argues that plaintiff does not produce contract machined component parts, but manufactures its own product lines instead. Defendant maintains that plaintiff's core products basically function to assist in the storage and handling of cables and hoses, and that defendant also constructs work benches with attendant accessories.

---

4. Defendant correctly maintains that unlike patents, trademarks are not rights in gross. *See DeCosta v. Viacom Intern., Inc.,* 981 F.2d 602, 609 (1st Cir.1992), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993). As such, courts are permitted to find no likelihood of confusion where litigants with the same name do not compete in the same market. *See, e.g., McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir.1979) (trademark "Drizzle" for expensive women's coats did not infringe upon registered "Drizzler" mark for cheaper golf jackets); *King Research, Inc. v. Shulton, Inc.,* 454 F.2d 66 (2d Cir.1972) ("Ship Shape" on hair spray did not infringe "Ship Shape" trademark for brush cleaners). Courts, however, are also permitted to find that a likelihood of confusion exists where the litigants are not competitors. *Forum Corp. of N. Am. v. Forum, Ltd.,* 903 F.2d 434 (7th Cir.1990); *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482 (5th Cir.1971). The key to the issue is whether the public is confused as to the origin of the goods or services offered.

Plaintiff contends that defendant's basic argument is that defendant's products go into automobiles whereas plaintiff's products are used in the assembly of automotive products. Plaintiff argues that Maurice Evans, the executive vice-president of Aero–Motive Company testified that plaintiff manufactures products that are incorporated into emergency vehicles and ground support equipment and that other products could be incorporated into electric cars and bottle gas vehicles. Plaintiff also contends that defendant begins its marketing by cold calls to prospective buyers who refer defendant to more sophisticated personnel. Plaintiff claims that the person initially contacted by defendant has a low level of sophistication and deals with a large number of potential suppliers for different aspects of the manufacturing process. Plaintiff also argues that the Court must use this initial contact as the typical consumer.

Even though the litigants both typically sell manufactured products to large automotive and aerospace companies, this Court finds that the litigants' products and services are somewhat related, but not competitive. "[S]ervices are 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners*, 931 F.2d at 1109. While the litigants' products are "related" insofar as they both manufacture goods for automotive and aerospace companies and insofar as someone receiving a cold call could very well confuse the two companies and their products, there is no evidence that the companies compete with each other in any way. Plaintiff sells pre-made products while defendant sells component parts in accordance with customer specifications. Also, even though the litigants both sell to some of the same large companies, such as General Motors, they are do not compete for the attention of the same professional buyers. *See Airwick Indus., Inc. v. Alpkem, Corp.*, 384 F.Supp. 1027, 1032 (D.Ore.1974) (even where both parties sell products to one hospital and "these orders are then usually processed by the hospital purchasing agent, the buyers are professionals in their fields who are not likely to be confused or deceived"). Also, if the products were in direct competition, there is a good possibility that plaintiff would have been able to present evidence of actual confusion. *See, infra*, Part II.D. Because this Court finds that the products offered by the litigants are somewhat related but not competitive, this factor does not favor either party.

## C. *Similarity of the Trademarks*

The Sixth Circuit set forth the standard for determining the similarity of the marks in *Homeowners*:

[I]n evaluating similarity of marks, " '[i]t is axiomatic in trademark law that "side-by-side" comparison is not the test.' " ... Instead, the marks must be viewed in their entirety and in context. "[A] court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.' " ... It is the overall impression of the mark, not an individual feature, that counts.

*Homeowners*, 931 F.2d at 1109 (citations omitted). "A proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of the conflicting marks." *Wynn Oil I*, 839 F.2d at 1188.

Due to major differences in brightness of color and style, this Court finds that the parties' respective marks differ in a clearly noticeable way in their logos and in their appearance on their business cards. (*See* Exhibits 21–26, 37, 40, 43.) Under this factor, however, the difference in the appearances of the marks is not dispositive. The Eastern District of Michigan recently discussed this issue in detail when determining that the plaintiff's marks, "Blockbuster" and "Blockbuster Video" were substantially similar to defendants' mark, "Videobusters." The court noted that even "[t]hough the appearance of Blockbuster's and Video Busters' marks are very different, "buster" is pronounced and verbally translated in exactly the same manner in both names." *Blockbuster Enter. Group v. Laylco, Inc.*, 869 F.Supp.

505, 512 (E.D.Mich.1994); *see also Wynn Oil Co. v. American Way Serv. Corp.,* 736 F.Supp. 746, 751–52 (E.D.Mich.1990) (while "defendant employs a different color scheme [and background design], this does not suffice to distinguish the marks."), *aff'd in part and rev'd in part,* 943 F.2d 595 (6th Cir. 1991). Where one feature, such as a word, in a mark has a greater impact on the potential buyer, it is given greater weight. *International Kennel Club, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1087–88 (7th Cir.1988); *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1570 (Fed.Cir.1983); *cf. Wynn Oil I,* 839 F.2d at 1187–88 (significant weight given the term "Classic" in both marks). In the instant case, the term "Aeromotive" is the dominant term in both marks. Furthermore, the pronunciation and meaning of the term "Aeromotive"—a general reference to the aerospace and automobile industries—is identical in both marks. These facts take on additional importance relative to the appearance of the marks because many potential buyers are initially introduced to defendant's products through "cold" telephone calls. Such consumers "do not have the mark before them but ... may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark." *Wynn Oil I,* 839 F.2d at 1187 (citation omitted).

The Eastern District of Michigan also held that differences between some of the words in the marks need not be dispositive. "[T]he different placement of the term "Video" in "Blockbuster Video" and "Video Busters" [does not] change the fact that the names are likely to cause confusion." *Blockbuster,* 869 F.Supp. at 512; *see also Wynn Oil I,* 839 F.2d at 1187–88 (marks "Classic" and "Classic Car Wash" sufficiently similar to create a likelihood of confusion).[5] In the instant case, the fact that one mark contains the work "Company" while the other has the terms "U.S." and "Inc." is also not dispositive. These words are commonly used in company names and do not aid customers in identifying a product.

It is also not very important that the professional buyers who ultimately purchase the products of the respective parties will understand the product's point of origin when the decision to purchase the product is made. In the Sixth Circuit, the Lanham Act's protection is not limited to confusion at the time when the purchases take place. *Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235, 1245 (6th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). One reason for this is to prevent the infringer from initially attracting potential customers based on the reputation earned by the owner of the original mark. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975). Because the initial contact with prospective customers is often made by phone, this Court finds that it would be very easy for the person answering the phone to confuse the two marks. As such, if the person answering the phone is familiar with plaintiff, defendant may gain additional entree as a result of plaintiff's reputation. Thus, this Court concludes that the marks are substantially similar on the whole.

## D. *Evidence of Actual Confusion*

No evidence of actual confusion between the trademarks was produced at trial. Evidence of actual confusion is clearly the best evidence of a likelihood of confusion. *Homeowners,* 931 F.2d at 1110. However, actual confusion is usually difficult to prove. Plaintiff need not demonstrate actual confusion to recover for trademark infringement. *Wynn Oil I,* 839 F.2d at 1188; *Blockbuster,* 869 F.Supp. at 513. This factor is entitled to be weighed more heavily where parties have been engaged in concurrent sales under the litigants' respective marks over an extended period of time. In such instances, isolated instances of confusion may lead to an infer-

---

**5.** A difference of one word between two trademarks might render the marks so dissimilar that there is no likelihood of confusion. *See Hillyard Chem. Co. v. Vestal Laboratories, Inc.,* 206 F.2d 926 (C.C.P.A.1953) (holding "shine-all" and "brighten-all" were dissimilar); *Harris Mfg. Co. v. Werber Sportswear Co.,* 183 F.2d 105 (C.C.P.A.

1950) (held that "zeroland" and "zero king" were dissimilar). In such cases, however, the change was in the dominant word in the mark. In the cases cited above, the terms common to both parties' marks, "all" or "zero," are two very common words that do not aid consumers in identifying a product.

ence that no likelihood of confusion exists. *Homeowners,* 931 F.2d at 1110.

■ The parties had used their marks concurrently for approximately 21 months before plaintiff even learned of defendant's existence. During that time and the time that followed, plaintiff has been unable to show any instances of actual confusion. This length of time would normally be enough to draw the inference that this factor militates against finding a likelihood of confusion. *See Oreck Corp. v. United States Floor Sys., Inc.,* 803 F.2d 166, 173 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (no actual confusion in 17 months of concurrent sales considered highly significant). However, in considering this factor, the court should consider not simply the length of time, but also "the conditions under which there has been concurrent use without evidence of actual confusion." *Olde Tyme Foods, Inc. v. Roundy's, Inc.,* 961 F.2d 200, 204 (Fed Cir.1992). In *Oreck,* the parties had sold products in direct competition, and the parties advertised extensively, often in the same trade journals and trade fairs. *Oreck,* 803 F.2d at 167–68. Also, if the initial phone contacts create confusion, such confusion would probably go unreported because other, more sophisticated, employees would be responsible for making the actual decision to purchase the products. In the instant case, there is no proof that defendant did any advertising at all from June 1992 to March 1994. On the other hand, both parties actively competed in the Dayton area during this time. (Trans. at 145). This Court will weigh this factor in the defendant's favor, but accord it little weight.

## E. *The Marketing Channels Used*

■ Under this factor, the Court will attempt to determine the extent of the overlap, if any, "in the media used to communicate with [the parties'] respective target markets." *Homeowners,* 931 F.2d at 1111. Where the parties target markets differ, there is less likelihood that there will be an overlap in the marketing channels used. *See Id.* at 1110–11. In short, this factor "consists of considerations of how and to whom the

respective goods or services of the parties are sold." *Id.* at 1110.

■ In the instant case, defendant argues that it sells to the product engineers who are professional machined component buyers in the automotive industry, fabricated metal component buyers in the aerospace industry, and Section 8 buyers with the Department of Defense. Also, according to Mr. Evans and plaintiff's counsel, exhibits # 29 and # 34 provide a complete list of plaintiff's customers in Ohio and Michigan. (Trans. at 126–27.) Mr. Kakde testified that defendant does not and has never done business with any of the names on the list. (Trans. at 288–89.) Defendant argues that plaintiff sells to professional buyers in the automotive industry, the plant engineers known as Maintenance and Repair Operation ("MRO") buyers who buy plant and manufacturing equipment only. Defendant also argues that while buyers frequently rotate within a group, buyers never rotate between groups. (*See* Trans. at 258, 344.) For example, defendant argues that an MRO buyer never becomes a production buyer or vice versa. Product and quality engineers also remain within the same groups. Defendant also notes that Mike Barron, plaintiff's sales representative in the Dayton, Ohio area testified that he was unaware of defendant's existence until he was asked to be a witness in this proceeding in November 1995. (Barron Dep. at 17.) Defendant implies that a sales representative would normally be familiar with his client's competitors and their marketing strategies.

Heather Isch, a marketing communications manager employed by plaintiff, testified that plaintiff advertises to individual engineers and the "automotive components" industry in general. Plaintiff argues that the customers for both parties are the same, even if the person ultimately responsible for buying the product is not.

■ This Court finds that the parties essentially "target" two different sets of people for their services. What is ultimately important under this factor is not the industrial employer who ultimately pays for the products, but rather the people (often employees) who actually make the decision to purchase the goods. *See Airwick Indus.,* 384

F.Supp. at 1032 (analysis assumed that professional buyers, rather than the hospital for which they work, are key to this analysis). Also, while an MRO buyer might have occasion to glance at a medium in which an advertisement for plaintiff appears, such as the W.W. Grainger catalogue, this fact is less important than the fact that the litigants direct most of their marketing energies at different groups of potential buyers. The evidence did not show that the litigants used similar marketing media. In fact, plaintiff has even argued that there is no evidence that defendant even advertised the fact of its existence while both were doing business in the Dayton area. (Plaintiff's Post–Trial Brief at 16.) Instead, defendant develops most of its initial business by directly contacting the prospective purchaser. Thus, there is no significant "overlap" in marketing channels used by the parties. Furthermore, Ms. Isch testified that plaintiff is continually trying to refine its marketing techniques in order to reach their potential buyers to the exclusion of all others. (Trans. at 191.) Thus, this factor favors defendant.

### F. *The Likely Degree of Purchaser Care and Sophistication*

██ When determining "likelihood of confusion," the court should normally assume that the buyer is a reasonable person exercising ordinary caution under the circumstances. *Homeowners,* 931 F.2d at 1111. Where, however, the typical buyer possesses more expertise than the typical consumer or the products being purchased are expensive or unusual, the buyer will generally "exercise greater care in her purchases." *Id.* As a result, there will be less likelihood of confusion, though the court is not precluded from finding a that a "likelihood of confusion" exists as a matter of law. *Id.*

██ In the instant case, plaintiff concedes that the purchasing systems of large industrial companies, their typical purchasers, are fairly sophisticated. Plaintiff, however, argues that these buyers frequently exercise a low degree of care in purchasing when dealing with companies with similar names. Plaintiff cites the repeated confusion between itself and two other competitors, "Aro Corp." and "Electromotive," with similar sounding names as evidence. (Trans. at 138, 147). Plaintiff argues that the likelihood of confusion increases where the names between two parties, i.e., the litigants, are verbally identical and nothing in the marketplace puts the "expert" buyers on notice of U.S. Aerometive, Inc.'s recent arrival in the marketplace.

Defendant argues that the persons representing all of their customers in purchasing decisions are all professional buyers and engineers. .Defendant also argues that a number of existing standardized procedures ensure that these buyers become very familiar with the companies from whom they buy products. For instance, when selling to an automotive customer, defendant must go through a process where it meets with a professional buyer and eventually submits a "study quote" detailing defendant's products and manufacturing process before a company will begin formal negotiations prior to placing an order with them. After an order is placed but prior to the actual manufacturing, the customer will subject defendant's products to a Production Part Approval Process to ensure that they meet the buyer's specifications. Defendant argues that the order procurement procedure is virtually identical in the aerospace industry, except that the buyers are titled "Machined and Fabricated Metal Components Buyers." Also, defendant notes that Section 8 buyers are similarly determined to investigate the companies with which they do business in order to determine if they have minority status.

Both parties agree that they usually sell their products to professional buyers who possess a high degree of sophistication. This fact indicates that there is less likelihood of confusion in the marketplace. While this factor favors the defendant, plaintiff's proof that these expert buyers still frequently confuse plaintiff's products with those of its competitors with similar-sounding names lessens the weight the Court will accord this factor. (Trans. at 138, 147.)

### G. *Defendant's Intent in Selecting its Mark*

██ Plaintiff is not required to prove this factor to demonstrate that a likelihood of

confusion exists. *Wynn Oil II*, 943 F.2d at 602. The Sixth Circuit has held that intentional infringement may be proven by circumstantial evidence. *Id.* at 603. Further,

> [U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement. . . . Moreover, where "trade-marks [have] been . . . long in use and . . . widely advertised, it is presumed that [the infringer] had knowledge of [the marks]."

*Id.* Defendant argues that the name "U.S. Aeromotive" was conceived by an employee, Douglas Fecher, as part of a contest. Mr. Fecher has testified that when he made up the name, he had never heard of plaintiff. Defendant argues that after the name was chosen from the contest entries, defendant's intellectual property counsel, an attorney employed by the Killworth, Gottman, Hagan and Schaeff law firm, approved its use in a letter which noted that counsel specifically considered the plaintiff's trademark. Defendant's counsel approved the use of "U.S. Aeromotive, Inc." in a letter dated July 10, 1991, because he believed the products and services offered by the plaintiff were "neither directly competitive nor closely related to [defendant's] activities."

Plaintiff contends that defendant's president, Mr. Kakde, was put on notice of plaintiff's existence by a letter from counsel dated January 10, 1991.[6] Plaintiff notes that the letter mentioned plaintiff by name and detailed plaintiff's product lines and trademark registrations. Despite this knowledge, defendant filed an intent to use trademark application which included products which overlapped with, or were closely related to, defendant's products. Plaintiff argues that defendant could not have reasonably relied on the advice of his counsel because a reasonable person would note the overlap in what was included in defendant's intent to use application and what plaintiff manufactures and sells. Plaintiff claims that a reasonable person would either conclude that

the parties were competitors or engaged in related activities or would have sought advice from a different attorney.

■ This Court finds that as a result of defendant's counsel's trademark search and subsequent advice, defendant was put on notice of plaintiff's registration and the use of its trademark. Defendant was put on notice prior to filing its intent to use trademark registration application on August 23, 1991. Absent additional information, the Court could infer that defendant intentionally infringed upon plaintiff's trademark. However, courts have also held that reliance on the advice of counsel will support a finding that a defendant acted without the intent to infringe on the trademark of another. *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir.1993). Also, a request for a trademark search is considered additional evidence of good faith in adopting a trademark. *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 584 (2d Cir.1991). For the purposes of this analysis only, the Court will assume that Mr. Kakde's reliance on his attorney's advice had to be reasonable in order to be asserted.[7]

This Court finds that defendant's reliance on the advice of counsel was reasonable. As the Ninth Circuit noted, "[t]rademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 716 (9th Cir.1974). While defendant's attorney may not have been incorrect regarding the highly technical question of whether defendant's intended use of the name "U.S. Aeromotive, Inc." constituted trademark or trade name infringement under the Lanham Act, the advice he gave to his client was not irrational. As noted earlier, this Court agrees that the litigants are not in direct competition. Further, because defendant's counsel was an intellectual property attorney by trade, the infringement issue was

---

6. The letter to which plaintiff refers was actually dated July 10, 1991, not January 10, 1991. (Exhibit BD.)

7. Considering that this factor calls into question the alleged infringer's subjective intent, it is by

no means clear to this Court that the alleged infringer's reliance need be reasonable as long as the reliance was in good faith. Because this Court need not reach this issue under its analysis, this Court declines to do so.

within his particular field of expertise. It would not be reasonable to expect a layman to substitute his opinion or even seek a second opinion where a seemingly competent attorney details the basis for his opinion on such a complex issue of law, especially when the issue lay within the attorney's particular area of expertise. Whether direct competition exists or activities are related in the context of potential trademark infringement are essentially legal determinations, even if the terms are commonly used in daily non-legal discourse. This Court finds that under the circumstances, it was not unreasonable for Mr. Kakde to rely on the advice of counsel. Furthermore, defendant contacted the Killworth, Gottman, Hagan and Schaeff law firm for the express reason of researching the issue of possible infringement. (Trans. at 312–13.) Defendant's effort is evidence of defendant's good faith. *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991). Also, Mr. Fecher's testimony that the name "U.S. Aeromotive, Inc." was originally created without knowledge of plaintiff's trademark was uncontradicted. Thus, this Court finds that defendant did not intentionally infringe upon plaintiff's mark.

### H. *Likelihood of Expansion of the Product Lines Using the Mark*

██ "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners,* 931 F.2d at 1112; *see also Wynn Oil II,* 943 F.2d at 604.

██ Plaintiff argues that there is a strong possibility that the parties' will find themselves in direct competition in the future because plaintiff grew out of the "job shop" phase, defendant is in this stage at present and its intent to use application contains products which would directly conflict with plaintiff's products, as Mr. Evans' testimony indicates. Further, plaintiff may want to go into past businesses or use its presently existing capacity to manufacture to produce more product lines in the future. Work stations, for example, present a high probability of the intersection of the parties' products in the future. Also, plaintiff argues that defendant may develop along the same lines as plaintiff.

Defendant argues that plaintiff stopped job shop (contract machining) work in 1957 to concentrate on manufacturing its own proprietary products in order to avoid the boom/bust nature of contract machining. Mr. Evans testified that plaintiff has no present intention to return to contract machining absent some kind of economic downturn. Defendant argues that, as Mr. Kakde testified, defendant has no plans to expand its business under the name U.S. Aeromotive beyond additional contract machining work and additional set-aside work for the Department of Defense.

This Court finds that even though plaintiff has the present manufacturing capability to do contract machining work, there is not a strong likelihood that plaintiff will return to the type of job shop work it abandoned in the late 1950s. As Mr. Evans testified, plaintiff evolved into a company able to manufacture its own product lines in order to help protect itself from the vagaries of our cyclical economy. (Trans. at 71–72.) Plaintiff has not engaged in such activity for over 35 years, and Mr. Evans testified that plaintiff has no present intent to return to such activities. (Trans. at 128.)

This Court finds, however, that there is a strong possibility that defendant will enter plaintiff's line of work at some point in the future. On August 23, 1991, defendant filed an intent to use trademark registration application with the U.S. Patent and Trademark Office. The application was published for opposition in the Official Gazette of the United States Patent and Trademark Office on March 22, 1994. The purpose of this application is to list the products an applicant would like to produce in the future. That the list was compiled by one of defendant's employees rather than Mr. Kakde himself is not relevant. Also, while Mr. Kakde testified at trial that defendant has no present intent to expand beyond the component business and manufacture products made by plaintiff, defendant has not withdrawn its intent to use application. The application refers to more than just present intent, it refers to what a

company might do in the future. Similarly, this factor is intended to anticipate the future commercial development of the litigants. Taking the intent to use registration application at face value, it seems as though defendant may be following the same evolutionary path as plaintiff. Defendant's application states that it intends to use the mark on jet engine components, aircraft ground support equipment, and automotive components. Mr. Evans testified that plaintiff has made components which could be classified under all of these general categories of products and that plaintiff still makes products—especially ground support equipment and cable assemblies—that would fit under these general classifications. (Trans. at 119–20.) Therefore, there is a strong possibility that one day, defendant will expand its product line such that it will put itself in direct competition with plaintiff. Thus, this factor favors the plaintiff.

## I. *Conclusion*

▮▮▮ To summarize this Court's findings which favor plaintiff: plaintiff's mark is strong with respect to the manufacturing sector of the aerospace and automotive industries; plaintiff's mark is substantially similar to defendant's mark; and there is a strong likelihood of expansion such that the parties will be in direct competition in the future. The factors which favor defendant include: the typical purchaser is highly sophisticated; the parties use different marketing channels; and there was no actual confusion demonstrated between the products despite a reasonable period of concurrent use and sales in the Dayton area. This Court accorded little weight to the actual confusion factor. While this Court did not find that defendant had an intent to infringe and this Court found that the litigant's products were somewhat related, these factors did not favor either party in a meaningful way. Also, this Court accorded little weight to the "actual confusion" factor and gave less weight than it normally would to the "buyer sophistication" factor.

While the ultimate resolution of this case is a difficult determination, this Court thinks it important that plaintiff has been utilizing its registered mark for nearly 50 years before defendant adopted its new name. "The newcomer has the clear opportunity, if not the obligation, to avoid confusion with well-known marks of others." *J & J Snack Foods, Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1464 (Fed.Cir.1991). In light of a consideration of the factors, this Court finds that there is a likelihood of confusion between the litigant's products and will enjoin defendant's use of the name "Aeromotive."

## J. *Injunction*

▮▮▮ Before a court can issue a permanent injunction, the party seeking the injunction must make a clear showing that significant irreparable injury will result if the injunction it seeks is not granted and that there is no adequate legal remedy available. *City of Parma, Ohio v. Levi*, 536 F.2d 133, 135 (6th Cir.1976). "In making the determination of whether an injunction should issue, a court is also required to weigh the public interests which may be affected by issuance of such relief." *Uniroyal Goodrich Tire Co. v. Hudson*, 873 F.Supp. 1037, 1041 (E.D.Mich.1994) (citing *Inland Steel Co. v. United States*, 306 U.S. 153, 157, 59 S.Ct. 415, 417, 83 L.Ed. 557 (1939)).

▮▮▮ "A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." *Wynn Oil II*, 943 F.2d at 608. The injury arises "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values...." *Id.* Thus, plaintiff has proven that it has suffered an irreparable injury and is without an adequate legal remedy. Further, the risk of harm to plaintiff is outweighed by the risk of harm to defendant. When plaintiff filed this lawsuit, defendant had been known by the name "U.S. Aeromotive, Inc." for about two and a half years. This short period of time, plus the lack of evidence that defendant did extensive advertising, plus defendant's description of the extensive investigatory procedures a customer undergoes before placing an order with defendant, combine to indicate that a simple name change will not

cause great hardship on defendant.[8] *See Blockbuster*, 869 F.Supp. at 516 (emphasis placed on fact that defendant "has been in existence for only five years, and it has not produced evidence of an extensive advertising campaign to promote its name). The sophistication of defendant's existing clientele should enable them to easily comprehend that this Court's decision will have no impact on the quality of defendant's products. Finally, trademark laws are designed to prevent consumer confusion and to protect the right of the trademark owner to control its product's reputation. *United States v. Hon*, 904 F.2d 803, 806 (2d Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991). It is therefore in the public interest to prevent consumer confusion between the litigants' products and to protect plaintiff's investment in promoting its name and reputation. Thus, this Court will enjoin defendant from using the name in the future.

### III. Common Law Dilution

 Count IV of the Complaint alleges that defendant has diluted plaintiff's trade name, trademark, and service mark in violation of the common law of Michigan. Plaintiff asserts that this cause of actions exists in Michigan, citing two cases for this proposition, *Homeowners*, 931 F.2d 1100 and *Consolidated Cosmetics v. Neilson Chem. Co.*, 109 F.Supp. 300, 310 (E.D.Mich.1952).[9] Michigan, however, has no common law cause of action for trademark dilution. *Homeowners* stated that Michigan "appeared" to recognize such a cause of action by citing *Consolidated Cosmetics*. *Consolidated Cosmetics*, however, only referred to the law in the First Circuit in discussing dilution, not the common law of Michigan. One federal court discussing *Consolidated Cosmetics* noted that

> [t]he State of Michigan ... has not legislatively adopted the anti-dilution doctrine but a United States District Court in Michigan in an opinion, *without adopting the doctrine*, observed that the doctrine has been sparingly applied.

*Westward Coach Mfg. Co., Inc., v. Ford Motor Co.*, 258 F.Supp. 67, 79 (S.D.Ind.1966) (emphasis added), *aff'd*, 388 F.2d 627 (7th Cir.1968).

In the instant case, this Court adopts the reasoning the Eastern District of Michigan set forth in a recent decision:

> Neither case [cited by plaintiff] cited any Michigan authority setting forth this cause of action, and the Court is unable to find any despite careful research. The Court will not presume to create such a cause of action in a state whose legislature and courts have not seen fit to do so. Despite having promulgated extensive regulations governing trade and commerce, the state legislature has yet to enact an antidilution statute. Neither does the common law in Michigan recognize such a cause. Accordingly, [plaintiff] cannot prevail on this claim.

*Wynn Oil Co. v. American Way Serv. Corp.*, 736 F.Supp. 746, 756 (E.D.Mich.1990), *aff'd in part and rev'd in part*, 943 F.2d 595 (6th Cir.1991). Count IV is therefore dismissed as a matter of law.

### IV. Attorney's Fees

 Under the law of the Sixth Circuit, attorney's fees may be awarded in "exceptional" Lanham Act cases where the trial court finds that "the infringement was malicious, fraudulent, wilful, or deliberate." *Hin-*

---

8. Defendant has changed its name once before without imposing great hardships on itself. Defendant had been known as "Tape Tech, Inc." from 1976 until 1992, a much longer period of time than it has been known as "U.S. Aeromotive, Inc." Also, when asked at trial if it was true that his "company would not suffer one iota of damages if the Court directed you to file an express abandonment in your pending intent-to-use trademark application because you have not used the mark on those goods and you do not intend to use the marks on those goods," Mr. Kakde stated "[t]hat is correct." (Trans. at 326.)

9. Plaintiff asserted in its trial and post-trial briefs that it is also be entitled to recover under Ohio's common law doctrine of trademark dilution. Plaintiff, however, only alleged a claim under Michigan common law in its complaint. Defendant never consented to try the issue under Ohio law; defendant has consistently argued this point with respect to Michigan state law. As such, there is no claim under Ohio state law presently before the Court.

*du Incense v. Meadows,* 692 F.2d 1048, 1051 (6th Cir.1982). A case is not "exceptional" if there is any doubt concerning the deliberateness of defendant's infringement. *Id.* at 1052. This Court awarded attorney's fees in *Countrywide Funding Corp. v. Countrywide Fin. Corp.,* 879 F.Supp. 771, 774–75 (W.D.Mich.1994) after it was found that the defendants acted in bad faith and essentially invited the litigation after it continued to use the name "Countrywide" long after it had expressly promised not to do so.

In the instant case, plaintiff alleges that defendant invited the litigation when it "reneged" on the parties' pretrial settlement negotiations. Plaintiff claims that the parties had nearly concluded a settlement in which defendant would change its corporate name in return for plaintiff's paying for the expenses relating to the name change when defendant pulled out of the negotiations. Plaintiff also argues that defendant intentionally infringed upon its trademark and that defendant's reliance upon the advice of counsel was unreasonable.

Plaintiff's claim that defendant invited the litigation is without merit. Plaintiff did not even allege that the parties ever reached on agreement upon which defendant could renege. How plaintiff can claim that defendant reneged on a promise that was never given is beyond the ken of this Court. Further, this Court has held that defendant did not intentionally infringe upon plaintiff's trademark due to defendant's reasonable reliance on the advice of counsel. Plaintiff's request for attorney's fees must be denied.

The Court will propose an Order for Judgment consistent with the findings of fact and conclusions of law set forth in this Opinion.

### JUDGMENT

For the reasons given in the Opinion issued on this date, **IT IS HEREBY ORDERED** as follows:

A. Plaintiff, Aeromotive Company's, request for a permanent injunction is **GRANTED.** Defendant, presently known as U.S. Aeromotive, Inc., is enjoined from using the term "Aeromotive", alone or in conjunction with any other word or phrase, to identify its business.

B. Defendant shall take all steps necessary to change its corporate name so that it will comply with the injunction set forth in paragraph A, and defendant shall cease using all letterheads, business cards, telephone identifications, purchase orders and other materials that identify it as "U.S. Aeromotive, Inc."

C. Pursuant to Fed.R.Civ.P. 62(c), the injunction set forth in paragraphs A and B are hereby suspended during the pendency of an appeal upon the filing of a cash security or an equivalent bond in the amount of $5,000, which is the amount this Court considers proper for the security of the rights of plaintiff.

D. Plaintiff Aeromotive Company's request for damages and attorneys' fees is **DENIED.**

E. Plaintiff is entitled to its costs.