**HAIR ASSOCIATES, INC., Plaintiff,**

v.

**NATIONAL HAIR REPLACEMENT SERVICES, INC., et al., Defendants.**

**No. 1:94–CV–574.**

United States District Court, W.D. Michigan, Southern Division.

Nov. 18, 1997.

---

Elizabeth S. Holmes, Elizabeth S. Holmes Law Offices, Grand Rapids, MI, for plaintiff.

Scott H. Hogan, David L. Harrison, Tolley, Vandenbosch, & Walton, PC, Grand Rapids, MI, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRENNEMAN, United States Magistrate Judge.

### I. Introduction.

This trademark infringement action was tried without a jury on April 23 through April 26, 1996. Near the close of defendants' proofs on April 26, plaintiff raised an objection to the testimony of defendants' final witness, a damages expert. The issue was ultimately resolved by permitting the parties to conduct additional discovery with regard to damage issues and the parties submitted additional damage proofs by way of deposition transcripts. The court heard final closing arguments on November 18, 1996.

The issues subject to trial, as narrowed by the court's April 16, 1996, opinion regarding defendants' motion for summary judgment (docket no. 89) and the joint final pretrial order (docket no. 91), include the following:

1. Whether defendant Donald Hale ("Hale") is liable for breaching the franchise agreement annexed to the amended complaint as Exhibit 1 by failing to pay certain fees and royalties to plaintiff Hair Associates, Inc. ("Hair Associates").

2. Whether defendants Hale or National Hair Replacement Services, Inc. ("National") are liable for infringement of trademarks, owned by Hair Associates, in violation of the Lanham Act.

3. Whether defendants Hale and National are liable for unfair competition based on infringement of Hair Associates' common law trademark rights.

4. The amount of damages and/or nature of injunctive relief, if any, to which Hair Associates may be entitled.

Pursuant to Federal Rule of Civil Procedure 52(a), the court's findings of fact and conclusions of law with regard to these issues are set forth below.

### II. Findings of Fact.[1]

The court notes at the outset that resolution of this dispute requires analysis of a

---

1. Trial testimony shall be referenced herein parenthetically by volume and page number. Some testimony was offered by way of deposition transcripts; such testimony shall also be referenced parenthetically by deponent name and page number. The parties introduced documentary exhibits at trial; such exhibits shall be referenced herein parenthetically by number for plaintiff's exhibits and by letter(s) for defendants' exhibits. Additional parenthetical references include "JFPO" for stipulations appearing in the joint final pretrial order, "FOF" for stipulations or admissions appearing in the parties' proposed findings of fact, "RFA" for responses to requests

series of complex transactions between the parties. The parties, in some instances, entirely failed to document the transactions; in other instances, the documentation prepared by the parties is simply incomplete. As a result, the court has been forced to reconstruct in some detail events which the parties, at the time the events occurred, did not consider sufficiently important to justify memorializing on paper, and now recall in contradictory ways. This posture frequently requires the court to pick one party's version of the events over the other party's, though neither is fully compelling nor internally consistent.

## A. Background.

Jules Borenstein, president of plaintiff and plaintiff's principal witness, started Monte Carlo Hairpieces, Inc. ("Monte Carlo") in 1969 as a manufacturer of men's hairpieces. (I 22). In 1980 Monte Carlo brought together its best customers for the purpose of jointly developing the hair replacement business. Monte Carlo invited these customers to jointly contribute funds to develop uniform advertising, education and training, under the name "Hair Replacement Systems". (I 22–23; III 8–9; Smith 10).[2]

A hair replacement is a specially manufactured hairpiece. The custom hair replacements made by Monte Carlo require making a plaster of paris mold of the customer's head. A counter mold, which is a duplicate of the customer's head, is made from the first mold and sent to the factory. At the factory, base materials are made to conform to the counter mold and the hair is woven into the foundation. The resulting hair replacement is attached to the customer's head using a variety of methods. The customer must come in periodically to have the hair replacement serviced or replaced. Some customers' heads have a sufficiently regular shape and hair color to use premade stock hair replacements. (I 27–29, III 35–36). Several enti-

ties compete with Monte Carlo as manufacturers of hair replacements.

On June 4, 1980, Monte Carlo filed an application in the United States Patent and Trademark Office ("USPTO") to register the mark "Hair Replacement Systems" on the principal register for the provision of hair replacement services. (EX 14, B). The application was rejected by the USPTO because of the prior registration on the supplemental register of "Hair Replacement Centers" and because the mark was merely descriptive. (EX C). Accordingly, Monte Carlo amended the application to request registration only on the supplemental register. (EX C). The mark was registered on the supplemental register (Reg. No. 1,80,-704) in accordance with the amended application. (EX 14). The mark shall be referenced herein as "the registered words." A copy of the registered words mark is annexed hereto as Attachment A.

Plaintiff Hair Associates was established as a Delaware corporation in 1984. Its officers included Jules Borenstein, Edward Smith and Leo Benjamin. In 1984, the corporation applied for and received authority to transact business in Florida. (JFPO). Monte Carlo then assigned the Hair Replacement Systems mark to Hair Associates. (I 67).

Hair Associates converted the advertising cooperative of Hair Replacement Systems, initiated by Monte Carlo, into a franchising system. Hair Associates served as the franchisor, doing business as Hair Replacement Systems. The customers who were members of the advertising cooperative were offered the opportunity to become Hair Replacement Systems franchisees. (E. Smith 11–12). By way of example, Hair Additions of Nashville, Inc., a corporation then owned by defendant Hale, was initially a member of the advertising cooperative and thereafter a Hair Replacement Systems franchisee. (III 7–9).

On October 24, 1985, Hair Associates filed an application with the USPTO to register a

---

for admission, and "FAC" for admissions appearing in the first amended complaint or answer.

2. At some time during the early 1990's, Jules Borenstein formed a company referenced by the parties as Metropolitan Hair Replacements. (I

23–24, Smith 42–44). Metropolitan is in the same line of business as Monte Carlo and has essentially taken over the business of Monte Carlo. (Smith 42–44).

trademark on the principal register consisting of the stylized letters "HRS" for hair and scalp products. (EX D). Hair Associates amended the application, changing the identification of goods from "hair and scalp products" to "cosmetics, namely hair shampoo, hair conditioner, hair lotions, hair spray and preparations for the scalp." (EX E). The mark was registered on the principal register on January 27, 1987 (Reg. No. 1,426,178) (EX 16). The mark shall be referenced herein as "the registered letters." A copy of the registered letters mark is annexed hereto as Attachment B.

On December 9, 1991, Hair Associates filed an application with the USPTO to register a service mark on the principal register consisting of the stylized letters "HRS" accompanied by the words "Hair Replacement Systems" arranged in a particular design for services, namely, procurement, sales, sizing, affixation, stylization and maintenance of hair pieces and related maintenance products for men and women. (EX F). Hair Associates amended the application, changing the identification of services to "retail store services featuring hair pieces and styling of same for men and women," and disclaiming the wording "hair replacement systems" apart from the mark as shown (EX G; I). The mark was registered on the principal register on December 8, 1992 (Reg. No. 1,738,805). (EX 15; I). The mark shall be referenced herein as "the registered logo." A copy of the registered logo mark is annexed hereto as Attachment C.

In 1986, Hair Associates of Michigan, Inc, was incorporated with Leo Benjamin as president, Jules Borenstein as secretary and David Bonaroti as manager. Hair Associates of Michigan, Inc., filed an assumed name certificate in April of 1986 as "Hair Replacement Systems." (JFPO). Hair Associates of Michigan, Inc. was formed as an alternative means to develop the Hair Replacement Systems franchise market. The corporation opened a Hair Replacement Systems studio in Grand Rapids, Michigan. The goal was to establish the studio as a successful business and then sell it. Mr. Borenstein intended to follow that model to open up studios all over the country. (I 43–44).

In 1987, Jules Borenstein asked Hale to help with the studio owned by Hair Associates of Michigan, Inc. in Grand Rapids. Hale worked at the studio for a period of two weeks in June of 1987 to investigate and remedy problems at the studio. When the old problems subsequently resurfaced later that year, Borenstein asked Hale to return permanently to Grand Rapids and manage the studio. Hale agreed and moved his family to Grand Rapids in late 1987. (JFPO).

## B. Hale's purchase of the Grand Rapids studio, and the signing of the franchise agreement.

Between the time he moved to Grand Rapids, and May 1, 1988, when he executed a franchise agreement for the Grand Rapids studio, Hale purchased the studio. However, the parties dispute how this was done. Hale contends he purchased the corporation Hair Associates of Michigan, Inc. (III 15). Borenstein contends he sold only the assets of the corporation to Hale (I 47–48). Since the nature of this transfer impacts the formation of the subsequent franchise agreement, and the parties cannot agree as to what type of transfer occurred, it is necessary for the court to decide. Unfortunately, there is no documentation of the sale (III 16).

Although the sale transaction was not memorialized in any document, subsequent documents in the record support Hale's contention. For example, Exhibit K is a federal tax return for Hair Associates of Michigan, Inc. for its fiscal year beginning February 1, 1988, and ending January 31, 1989. The return was prepared by Hale's tax professional at Hale's request. (IV 37–39, 62–64). The federal employer identification number is the same as that used by the corporation prior to the purchase. (EX 2). If Hale purchased only the assets, he would not have filed a tax return for the corporation.

Moreover, if Hale purchased only the assets, the corporation should have filed a different tax return reflecting the income from the sale of the assets. No such return was offered into evidence.

Additionally, in July of 1989, Hale and Borenstein signed a sales agreement (EX 5)

whereby Hale sold 100 shares of stock representing ownership of · Hair Associates of Michigan to another corporation, Advanced Hair Studios of Miami, Florida, d/b/a Hair Replacement Systems, represented by Borenstein. Hale could only sell the stock if he had purchased it from Borenstein in the first place.

Accordingly, for all these reasons the court finds that Hale purchased the stock of Hair Associates of Michigan, Inc. rather than the assets.

On May 1, 1988, the franchise agreement that is the subject of this lawsuit was signed (JFPO). The franchise agreement was a standard pre-printed franchise agreement prepared by counsel for Hair Associates, Inc. (I 116), with certain names filled in on the blank spaces. The agreement provides that it shall not be modified or amended except in writing, and signed by the parties (EX 3).

The agreement (EX 3) identifies Hair Associates, Inc. as the franchisor and "HRS of Michigan" as the franchisee (FOF 11/11). The agreement includes among other things the following pertinent provisions:

¶ 1. Franchisee has the exclusive franchise to operate an HRS studio in Kent County, Michigan. Franchisee may use franchisor's marks. Franchisee acknowledges the validity of the marks.

¶ 2. The term of the agreement is five years.

¶ 4. Franchisee shall pay in initial franchise fee of $10,500.00.

¶ 5. Franchisee shall pay a monthly royalty fee of $500.00. Franchisee must pay a supplemental royalty, determined by a formula, if it fails to purchase a certain number of hair replacements each month.

¶ 6. Franchisee shall pay a monthly advertising fee of $100.00.

¶ 10. Franchisee shall purchase all hair replacements, accessories, and grooming products from franchisor or approved vendors. Monte Carlo is an approved vendor of hair replacements.

¶ 11. Franchisor may terminate the agreement for a number of reasons, including consistent failure to pay dues and fees or repeated failure to comply with the franchise agreement.

¶ 12. The franchise and franchise agreement may be assigned with the written consent of the franchisor.

¶ 13. The franchisee shall cease doing business as an HRS studio, cease using all HRS marks and return all materials to the franchisor upon termination of the franchise agreement.

¶ 16. Neither the franchisee nor its principals shall compete for a period of time in a defined area following termination of the franchise.

¶ 20. The agreement shall not be amended except in writing, signed by the parties.

¶ 21. The agreement benefits and binds the franchisee, his successors, heirs and assigns.

¶ 24. The agreement shall be construed and interpreted under the laws of the state of Michigan.

The agreement was hand signed for the franchisor, Hair Associates, Inc., by Jules Borenstein. The agreement was hand signed for the franchisee by Don Hale as follows: "Don Hale, President." (FOF 12/11). Beneath the signature line for the franchisee, the word "Individually" was preprinted. There was an additional signature line for another franchisee signature, which also had the word "Individually" preprinted below it, but this line was left blank (EX 3). Borenstein contends it was his intent that Hale be individually bound by the franchise agreement. (I 48). Hale testified that he signed as president of Hair Associates of Michigan, Inc. (III 17–18, 93), although he was never formally elected to that office (III 90–91).

Borenstein contends that only assets were sold, accordingly, he contends that the reference to "HRS of Michigan" as the franchisee simply designates the Grand Rapids studio, the assets of which belonged to Hale individually after the purchase. (I 45, 113). Borenstein's testimony, however, was not entirely consistent, While he initially indicated that "HRS of Michigan" was an assumed name of Hair Associates of Michigan, Inc. (I 44), he thereafter indicated that the assumed name was "Hair Replacement Systems" and not

"HRS of Michigan" (I 45), and then he indicated that the names were interchangeable (I 45).

Hale contends that "HRS of Michigan" was an assumed name of Hair Associates of Michigan, Inc. "HRS of Michigan" was the name on the checking account transferred to Hale in connection with the sale (III 13, 15–17). Moreover, Exhibit 5, the sales/security agreement mentioned above, which was signed by both Hale and Borenstein, includes the following language: "Hair Assoc. of Michigan D.B.A.—H.R.S. of Michigan". Hale also testified that he had never filed an assumed name certificate for or conducted business individually as "HRS of Michigan" (111 16).

The court finds that HRS of Michigan was an assumed name of Hair Associates of Michigan, Inc., the corporation which was sold to Hale. Accordingly, the franchisee in the agreement is Hair Associates of Michigan, Inc., and not Hale individually.

### C. Advanced Hair Studios, Inc. purchases the Grand Rapids studio.

In June of 1989, Louis Brooks and Jules Borenstein formed Advanced Hair Studios, Inc. ("Advanced"). Don Hale subsequently became a shareholder and officer of Advanced. (JFPO). Jules Borenstein was the secretary and treasurer of Advanced from 1989 to 1991. (RFA5).

On July 1, 1989, Advanced and Hale executed the previously mentioned sales/security agreement in which Hale sold to Advanced one hundred shares of stock, representing his ownership interest in Hair Associates of Michigan, Inc. JFPO; EX 5, III 190. Thus, Advanced became the owner of Hair Associates of Michigan, Inc.[3] Each of the three principals of Advanced, Borenstein, Hale and Brooks, denied preparing the document (I 195, III 21, 179).

Advanced continued to operate the studio in Grand Rapids as a hair replacement studio and continued to use the letters "HRS" and the words "Hair Replacement Systems." (JFPO). Advanced also operated studios in

Ft. Lauderdale, Florida and Miami (Kendall), Florida. (JFPO). Hale moved his family to Florida in 1989 where he worked for Advanced (JFPO), but the business of Advanced was not successful. In early 1991, Hale returned to Grand Rapids to manage the Grand Rapids studio. (JFPO).

The monthly royalties and advertising fees, billed by plaintiff for the Grand Rapids studio pursuant to the franchise agreement, were paid by Advanced through April of 1990. (I 52; III 24–26; EX 12). Through the rest of 1990 and the first six months of 1991, the monthly royalties and advertising fees were billed, but not paid. (EX 12).

On May 16, 1991, after Hale had returned to Grand Rapids, Borenstein sent Hale a letter (EX 13) demanding payment of dues and quota owed under the franchise agreement for the Grand Rapids studio. (I 54; III 34). Hale contacted Borenstein to discuss the issue, informed Borenstein that he could not pay the dues and quota and that he was willing to change the name of the studio. (III 34–35). Hale testified that Borenstein agreed to forego the dues and quota obligations. (III 34–35). Borenstein acknowledged that he reached some accommodation with Hale as to the fees; however, Borenstein's testimony was not entirely consistent with Hale's in that Borenstein claimed it was an agreement to reduce rather than eliminate the fees and the timing was different. (III 34–35; I 54–55). Hale's account is supported by Exhibit 12 which discloses that the Grand Rapids studio was not billed for any royalties or fees for the entire twelve month period after Hale alleges Borenstein agreed to forego them, and by the testimony of Edward Smith, a fifty percent shareholder of Hair Associates, Inc. (Smith 28–29).

### D. Hale takes back the assets of the Grand Rapids studio.

On January 21, 1992, Advanced, through its president, Hale, assigned and transferred all the non-inventory assets of the Grand Rapids studio to Hale. (JFPO). The assignment, Exhibit 7, states that it is an "assets

---

**3.** The corporation known as "Hair Associates of Michigan, Inc.," dissolved automatically on May 15, 1991 for failure to file annual reports. (JFPO).

only" assignment and that all liabilities continue to be the sole obligation of Advanced. Neither of the other principals, Brooks and Borenstein, objected to the assignment and both understood that Hale was taking back the Grand Rapids studio.

In February of 1992, Hale incorporated Hair Additions, Inc. under the laws of the state of Michigan. (JFPO; FAC 7). Hale was an officer and resident agent of Hair Additions, Inc. (FAC10). On April 1, 1992, Hale executed a written transfer of the non-inventory assets of the studio in Grand Rapids to Hair Additions, Inc. (JFPO; Ex 26). Hair Additions, Inc., operated the Grand Rapids studio thereafter. The parties do not agree as to whether plaintiff or Borenstein were ever made aware of this fact.

During the spring of 1992, Hale contacted Borenstein, informed him that the Grand Rapids studio was doing better financially, and offered to begin paying three hundred dollars a month for the use of the Hair Replacement Systems name. (III 44). Borenstein agreed. (III 44). The Grand Rapids studio was billed the three hundred dollar fee for the first and only time in June of 1992. (EX 12). The three hundred dollar fee was not billed again (EX 12); however, the Grand Rapids studio paid the fee for June, July, August and September of 1992. (EX N).

### E. Termination of the "franchise."

By letter dated October 26, 1992, Borenstein informed Hale that his franchise was being terminated for consistent failure to pay royalties and fees. (EX 9). Borenstein requested that Hale, pursuant to the terms of the franchise agreement, pay all debts to his vendors, pay all debts to the franchiser, return all H.R.S. materials and cease using the name. (EX 9).

Hale, or employees of the Grand Rapids studio, either returned or destroyed all HRS materials (except for a few forms and some brochures) within a few days after receiving the October 26, 1992 letter. (III 49, 51; Nugent 8; II 101–102, 117, 125, 127, 130, 138, 144–146). Moreover, on or near the date Hale received the termination letter, he met with the studio employees and informed them that the studio could no longer use the

Hair Replacement Systems or HRS names and that the new name would be National Hair Replacement Services ("National"). (III 47, II 93–94, 116–117, 127, 137–140, 150, Nugent 7). James Denny, a graphic artist and a customer of the studio, was contacted and asked to develop a new logo for National. (III 47–49, 51–53, 11 139–140, Denny –9).

Denny developed a logo which consisted of the letters "nHRS" and the words "national Hair Replacement Services". (Denny 8–13, Denny EX 4, III 48–49). Either these letters or the letters along with the words were then used by the studio on forms, signs, letterhead, envelopes, business cards, signs and advertising. (Denny EXS 2, 4, II 139–140, 150, EXS 19, 20, 23, X, Y, Z, WW). Copies of the logos are annexed hereto as Attachment D.

In February of 1993, Hair Additions, Inc. amended its articles of incorporation and changed its name to "National Hair Replacement Services, Inc." ("National") and filed an assumed name certificate of "Hair Replacement Services." (JFPO). Hale is an officer and resident agent of National. (F & C 11).

On at least two occasions approximately two years after the franchise was terminated, during September of 1994, the Grand Rapids studio ran advertisements in the Grand Rapids Press which used a modified version of National's logo. This logo used the letters "HRS" without the small "n" and the words "Hair Replacement Services" without the "National." (EX 23).

The 1993 Ameritech Yellow Pages advertisement for the Grand Rapids studio includes the Hair Associates trademarked letters "HRS." (EXS 20, W). This advertisement was purchased before the termination of the franchise and could not be changed after the termination. (II 156). Subsequent Yellow Pages advertisements used the National logo (EXS 20, X and Y); however; the 1994 Ameritech Business White Pages, under the listing Hair Replacement Systems referred readers to National. (EX X, III 67, 159, 170–172).

On at least one occasion after the franchise was terminated, employees of National an-

swered the telephone using the letters "HRS." (I 59, II 117, 124–125).

During the fall of 1994, the Grand Rapids studio inadvertently sent out brochures that included the letters "HRS" and the words "Hair Replacement Systems." (III 62–63). The letters in this instance however, were not stylized in the same manner as the letters registered by Hair Associates. (EX 21). The brochures had been purchased from a studio in Atlanta which was an initial member of the old advertising cooperative. (III 61–62, Smith 20–21). The Atlanta studio used the letters "HRS" and the words "Hair Replacement Systems" before they were registered by Monte Carlo or Hair Associates. (I 23, 163–165, Smith 20–21).

Despite National's efforts to change their signage to eliminate references to "HRS" or "Hair Replacement Systems," a sign displaying the words "Hair Replacements Systems" remained as part of a larger composite street sign, which advertised all of the businesses in National's building, until some time in 1995. (EX 18, III 59–60).

### F. The Hair Transplant Business.

Plaintiff does not sell surgical hair transplant services, nor does it license its marks for use in connection with the sale of such services. During 1993, defendant National began operating a surgical hair transplant business under the name "Hair Replacement Clinic," in an office next door to its hair replacement studio. Mr. Denny developed a logo for the surgical hair transplant business which consisted of the letters "HRC" in a particular stylization and the words "Hair Replacement Clinic." Copies of these logos are annexed hereto as Attachment E. Either the letters or the letters along with the words were used by the transplant business on forms, signs, letterhead, envelopes, business cards, signs and advertising. In April of 1994, National filed an assumed name

certificate for "Hair Replacement Clinic." (JFPO). By the end of 1995, National conducted all of its business, the hair replacement business as well as the surgical transplant business under the "Hair Replacement Clinic" name and letters.

### G. Plaintiff's Response to Defendants' Actions.

By letter dated December 10, 1992, Borenstein informed Hale that the HRS materials had not been received and that Hair Associates was advertising for a new franchisee in the Grand Rapids area. (EX 10). To date, Hair Associates claims it has been unsuccessful in its attempt to find a new franchisee in the Grand Rapids area

By letter dated January 15, 1993, Borenstein again requested return of the HRS materials and payment of all royalties and fees. (EX 11). On February 3, 1993, Hale's counsel sent Borenstein a letter (EX 17) informing him that Hale was not using the "HRS" name and that Hale's new corporate name was National Hair Additions, Inc. Shortly thereafter, Borenstein sent Hale a handwritten letter dated February 10, 1993 (EX R). in which Borenstein suggested that the parties let "bygones be bygones." When Borenstein ultimately discovered the names under which defendants were conducting business, including the inadvertent uses of plaintiff's marks and the purposeful uses of defendants' new marks, he filed this lawsuit.

## III. Conclusions of Law

### A. Hale's liability under the franchise agreement.

■ The court concludes that Hale is not personally liable for failure to pay royalties or fees required by the franchise agreement. The franchise agreement identifies HRS of Michigan as the franchisee[4] and was signed by Hale as "Donald Hale, President."[5] If

---

**4.** The court has found as a matter of fact that HRS of Michigan was an assumed name of Hair Associates of Michigan, Inc., the corporation Hale purchased from Borenstein.

**5.** Even if Hale was not formally elected as the president of the corporation, the testimony re-

vealed that he acted in that capacity. Hale was, therefore, a *de facto* officer:

'A *de facto* officer is one who is in possession of an office and discharging its duties under color of authority. [citation omitted] By color of authority is meant authority derived from an election or appointment, however irregular or informal. . . .'

the agreement said nothing more, it would bind HRS of Michigan and not Hale individually because in signing the document as he did, Hale was acting as the agent of a disclosed principal. Where a contract is signed by the agent of a disclosed principal, it binds the principal and not the agent. *Whitney v. Wyman,* 101 U.S. 392, 396, 25 L.Ed. 1050 (1879); *Hall v. Encyclopaedia Britannica, Inc.,* 325 Mich. 35, 37 N.W.2d 702 (1949); *Riddle v. Lacey & Jones,* 135 Mich.App. 241, 246–47, 351 N.W.2d 916 (1984); Restatement (Second) of Agency § 320 (1979).

The agreement in this instance, however, says something more. Under the signature line for Hale's name, the word "Individually" appears. The word is in the same type face as the rest of the agreement and was clearly on the agreement before Hale signed it. Thus, the court is called upon to construe the meaning of an agreement in which the signature block contains the words "FRANCHISEE" "Don Hale, President" and "Individually." In so doing, the court's primary task is to give effect to the parties' intention. *Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.,* 608 F.2d 1106, 1109 (6th Cir.1979). Both parties have provided testimony as to their intent; and, not surprisingly, the intentions they expressed at trial were at odds. Hale contends he signed as president for the corporation (III 93), while Borenstein testified he intended to bind Hale individually (I 48).[6]

The parties' after-the-fact statements of their respective intentions, however, are not controlling. The initial source of the parties' intention is the language of the agreement and, "[i]t is a cardinal principle of construction that a contract is to be construed as a whole; that all its parts are to be harmonized so far as reasonably possible; and that no part is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable." *Associated Truck Lines,*

*Inc. v. Baer,* 346 Mich. 106, 110, 77 N.W.2d 384 (1956) (quoted with approval in *Sightseer,* 608 F.2d at 1109–10).

Here, to construe the agreement, including the signature line, in such a way that Hale signed only as the agent of HRS of Michigan is to eliminate the word "Individually." Similarly, to construe the agreement in such a way that Hale is only personally liable effectively strikes the identification of HRS of Michigan as the franchisee on the first page of the agreement. Unfortunately, to construe the agreement in such a way that Hale and HRS of Michigan both enjoy all benefits and bear all burdens of the agreement eviscerates the ultimate purpose of the agreement: the establishment of an *exclusive* franchise. Although this might seem to eliminate all of the possibilities, there remains a reasonable reading of the agreement which harmonizes the apparent inconsistency in the signature block and retains the exclusivity of the franchise.

With one notable exception, the agreement outlines the rights and duties of the franchisor, Hair Associates, Inc., and the franchisee, HRS of Michigan. In paragraph 16, however, the agreement expressly creates a duty for someone else: "the Principals of the Franchisee." Specifically, paragraph 16 provides that in the event of termination, the principals of the franchisee shall not engage in a business similar to the franchise in a defined area for two years. For this language to bind the principals of the franchisee, they must necessarily sign the agreement. Thus, the agreement, including the signature block, can be construed harmoniously by concluding that the parties intended Hale's signature as president of the franchisee to bind the franchisee and Hale's signature individually to bind him personally, as a principal of the franchisee, to the noncompetition provisions of paragraph 16.

---

*Carpenter v. Clark,* 217 Mich. 63, 72, 185 N.W. 868 (1921). Though *Carpenter* involved public office, the Michigan courts have applied the doctrine to officers of private corporations and determined that a *de facto* officer of a private corporation has no greater liability than a *de jure* officer. *Martin v. Miller,* 336 Mich. 265, 277–78, 57 N.W.2d 878 (1953).

6. It is noteworthy that Borenstein testified he signed the agreement after Hale had already signed it (I 116). Thus, Borenstein had the opportunity to review and raise the issue regarding Hale's signature before Borenstein signed the agreement on behalf of plaintiff. Borenstein apparently had no problem with the manner in which Hale signed the agreement.

The court construes the agreement accordingly. Absent this construction, the signature block is inherently ambiguous and inconsistent.[7] Hale's only personal liability on the franchise agreement relates to the non-competition covenant in paragraph 16 of the agreement. All such claims have been dismissed on defendants' motion for summary disposition. Any claims for fees and royalties due under the franchise agreement are available only against Hair Associates of Michigan, Inc., which was dissolved by operation of law at a time when Advanced was the sole shareholder. In short, the court concludes that Hale is not liable to Hair Associates, Inc. on Count I of the first amended complaint, regarding breach of the franchise agreement.

### B. Trademark Infringement and Unfair Competition.

■ The remaining counts of plaintiff's first amended complaint, counts II, III, and IV, allege that National and Hale are liable for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), and the common law. Resolution of these claims depends on one test: is there a likelihood of confusion. *See Chrysler Corp. v. Newfield Publications, Inc.*, 880 F.Supp. 504, 509 (E.D.Mich.1995) ("The test for unfair competition under § 1125(a) is identical to that for trademark infringement under 15 U.S.C. § 1114, whether there is a likelihood of confusion."); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir.1983) ("[T]he test for equitable relief under both [15 U.S.C. § 1125(a)] and Michigan common law is the

'likelihood of confusion' standard."). Under the "likelihood of confusion test," the same factors are considered under both sections of the Lanham Act and the Michigan common law. *Wynn Oil Co. v. American Way Serv. Corp.* 943 F.2d 595, 604–05 (6th Cir.1991) (herein *Wynn Oil II*). Plaintiff must also establish ownership of the marks. *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1105 (6th Cir.1991).[8]

#### 1. Ownership of the marks.

■ As to ownership, plaintiff's registration of the registered letters and registered logo marks constitutes *prima facie* evidence of ownership as well as the exclusive right to use the marks. *Id.*; 15 U.S.C. §§ 1057(b), 1115(a). Defendants have presented no evidence to refute plaintiff's claim to ownership of these marks. Plaintiff is not entitled to this presumption, however, with regard to the registered words mark as it is registered only on the supplemental register. 15 U.S.C. § 1094. Ownership of this mark must be proven under the common law.

■ The Lanham Act does not create property rights; it merely provides a means of registering and enforcing in the federal courts rights otherwise recognized under the common law. *In re Trade–Mark Cases*, 100 U.S. 82, 25 L.Ed. 550 (1879); *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795 (3d Cir.1949). In Michigan, ownership of a trademark is established by showing appropriation and use of the mark:

> Trademark rights arise out of appropriation and use. Generally, the right belongs to one who first appropriates and uses the mark. [citation omitted]. But mere adop-

7. If the construction the court adopts were determined to be unreasonable on appeal, the court would apply rules of construction to delete the term "Individually" as it is the term which would appear to be mere surplusage. Two rules of construction support this result: (1) the rule that written material governs over inconsistent printed material, *Mansfield Machine Works v. Lowell*, 62 Mich. 546, 554, 29 N.W. 105 (1886): *Berk v. Gordon Johnson Co.*, 232 F.Supp. 682, 687 (E.D.Mich.1964); and (2) the rule that an ambiguous contract is construed against the party who prepared it, here, Hair Associates, Inc., *Sightseer*, 608 F.2d at 1110; *Com–Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp. 1229, 1230 (E.D.Mich.1971); *Sroka v. Catsman Transit–Mix*

*Concrete, Inc.*, 350 Mich. 672, 86 N.W.2d 801 (1957).

8. Plaintiff must further show that the marks have been in continuous use and that any merely descriptive marks have secondary meaning. *Homeowners Group*, 931 F.2d at 1105. The parties do not dispute that plaintiff has used the marks continuously and, as set forth fully below, only one of plaintiff's marks is merely descriptive. *See* § III.B.2.a. *infra*. Because the "likelihood of confusion" analysis requires an in-depth inquiry into the secondary meaning of this mark, the issue is discussed in connection with that analysis.

tion of a particular mark is inadequate. Rights grow out of usage. [citations omitted].

*Interstate Brands Corp. v. Way Baking Co.,* 79 Mich.App. 551, 555, 261 N.W.2d 84 (1977) *rev'd on other grounds,* 403 Mich. 479, 270 N.W.2d 103 (1978). It is undisputed that plaintiff adopted and used the words "Hair Replacement Systems" in Michigan. Thus, plaintiff has established its ownership of this mark.

## 2. Likelihood of confusion under the eight factor test.

When determining whether there is a likelihood of confusion between trademarks, the court must consider eight factors: (1) the strength of plaintiff's mark; (2) the relatedness of the products or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care and sophistication; (7) the intent of the defendant in selecting its mark; and (8) the likelihood of expansion of the product lines using the mark. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 279–80 (6th Cir.1997) (herein *Daddy's Junky Music* ) *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1106 (6th Cir.1991); *Countrywide Funding Corp. v. Countrywide Fin. Corp.,* 879 F.Supp. 771, 773 (W.D.Mich. 1994). The numerical listing of these factors does not imply any mathematical precision. The factors "are simply a guide ... and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988) (herein *Wynn Oil I* ). Consideration of the eight factors is intended to serve no purpose other than assisting in the resolution of the "ultimate" question: "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group,* 931 F.2d at 1107.

**9.** In *Daddy's Junky Music,* the Sixth Circuit considered the last two categories as one category.

### a. The Strength of Plaintiff's Marks.

**"[T]he strong mark enjoys greater protection while the weak mark is afforded little support."**

*Hindu Incense v. Meadows,* 692 F.2d 1048, 1050 (6th Cir.1982).

Consideration of a mark's strength requires a determination of the mark's "distinctiveness and degree of recognition in the marketplace." *Homeowners Group,* 931 F.2d at 1107. A mark is strong "if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Id.* Put differently, "distinctiveness" may be inherent or acquired. *Id.*; *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992).

To determine the inherent distinctiveness of a mark, courts routinely classify the mark as falling in one of five categories: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos,* 505 U.S. at 768, 112 S.Ct. at 2757; *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1116–17 (6th Cir.1996); *Aero–Motive Co. v. U.S. Aeromotive, Inc.,* 922 F.Supp. 29, 36–37 (W.D.Mich.1996).[9] The Sixth Circuit has described these categories as follows:

A generic term is the weakest type of mark; it is a term used to commonly describe the relevant type of goods or services ... Descriptive terms come next in the hierarchy: " 'A merely descriptive term specifically describes a characteristic or ingredient of an article.' " ... The third type of term is "suggestive," which, as the word implies, " 'suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods.' " ... "An 'arbitrary' mark has a significance recognized in everyday life,

*Id.* at 280–81.

but the thing it normally signifies is unrelated to the product or service to which the mark is attached,"... "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned,".....

*Champions*, 78 F.3d at 1117 (citations omitted). Generic marks receive no protection because they are not registrable as trademarks. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757. Marks classified as "descriptive" are not considered inherently distinctive and will not receive protection unless the mark's holder proves that the mark has acquired a "secondary meaning" in the marketplace thereby making it distinctive. *Id.* at 769, 112 S.Ct. at 2757–58.[10] Suggestive, arbitrary and fanciful marks, however, are considered inherently distinctive and, therefore, are entitled to protection. *Id.* at 768, 112 S.Ct. at 2757.

Rather than relying on either inherent or acquired distinctiveness, plaintiff contends its marks are strong by virtue of their incontestability. The Sixth Circuit has concluded, based upon the Supreme Court's decision in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), that incontestable marks "must be considered strong and worthy of full protection." *Wynn Oil I*, 839 F.2d at 1187. Subsequently, the Sixth Circuit acknowledged that the *Park 'N Fly* decision did not equate incontestability with strength. *Wynn Oil II*, 943 F.2d at 600. Nonetheless, the

*Wynn Oil II* panel followed *Wynn Oil I* as "controlling authority." *Wynn Oil II*, 943 F.2d at 600.[11]

A trademark will be considered incontestable after it has been in continuous use for five consecutive years following federal registration if: (1) there has been no adverse final decision regarding the registrant's ownership or right to register or retain registration of the mark; (2) there is no proceeding pending in the USPTO or in a court regarding ownership or registrations rights; (3) the mark is not a generic name for the goods or services for which it is registered; **and** (4) an affidavit is filed with the Commissioner within one year after expiration of the five year period which (a) sets forth the goods and/or services in connection with which the mark has been in continuous use for the five consecutive years and (b) sets forth the factual allegations necessary to support (1) and (2) above. 15 U.S.C. § 1065. Once established, incontestability relates only to those goods or services for which the mark was initially registered. 15 U.S.C. § 1065; *Aero–Motive Co.*, 922 F.Supp. at 37.

█ Plaintiff's claims that its marks are incontestable must fail. As to the registered words, plaintiff's claim fails because that mark is registered only on the supplemental register and, thus, cannot become incontestable. 15 U.S.C. § 1065; *Clairol, Inc. v. Gillette Co.*, 389 F.2d 264, 267 n. 6 (2d Cir.1968). As to the registered logo, plaintiff's claim fails because the logo, registered on December 8, 1992, has not been registered and in

10. "Secondary meaning" is simply another term for acquired distinctiveness. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58. "To establish secondary meaning, it must be shown that the primary significance of a mark in the mind of the consuming public is not the product but the producer." *Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F.Supp. 656, 661 n. 14 (E.D.Mich.1992). This significance might be ascertained from survey evidence, the length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, and the volume of sales. *Id.*

11. Although *Wynn Oil II* purports to follow *Wynn Oil I* on this issue, it also attempts to explain it by reference to an Eleventh Circuit decision, *Dieter v. B & H Indus.*, 880 F.2d 322 (11th Cir.1989), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). In *Dieter*, the

court held that an incontestable mark is "presumed to be at least descriptive with secondary meaning," and further that "its validity *cannot* be challenged on the grounds that it is merely descriptive...." *Id.* at 328–29 (emphasis added). *Dieter*'s formulation (incontestability = a presumption that the mark is at least descriptive with secondary meaning = a relatively strong mark) is certainly closer to the Supreme Court's holding in *Park 'N Fly* than the broad statement in *Wynn Oil I* (incontestability = strength) and would permit an attack on the strength of the mark, by way of rebuttal of the presumption, even though it is incontestable. *See Aero–Motive Co.*, 922 F.Supp. at 37. A recent Sixth Circuit decision appears to have cleared up any confusion created by *Wynn Oil I* and *Wynn Oil II*. In *Daddy's Junky Music*, the court expressly adopted the *Dieter* standard. *Id.* at 282.

continuous use for five years. 15 U.S.C. § 1065.

■ As to the registered letters, plaintiff's claim fails because it has failed to show that the affidavit required by the Lanham Act was ever filed. 15 U.S.C. § 1065. Even if the required affidavit had been timely filed with the USPTO, the registered letters mark would only be incontestable with regard to those goods or services for which it was initially registered. The mark was registered for "cosmetics, namely hair shampoo, hair conditioner, hair lotions, hair spray and preparations for the scalp." (EX E). Plaintiff has not offered any evidence that defendants used the mark or a confusingly similar mark on such goods. Accordingly, incontestability of the registered letters mark would not improve plaintiff's claim of infringement. Put simply, there is insufficient evidence in the record to establish that any of plaintiff's marks are incontestable.

Even though plaintiffs marks are not incontestable, they might still be strong if they enjoy either inherent or acquired distinctiveness.

### (i). The strength of the registered words mark.

■ The words "Hair Replacement Systems" are certainly not arbitrary or fanciful. Nor are they suggestive; they do not "suggest[ ] rather than describe[ ] an ingredient or characteristic of the good and require[ ] the observer or listener to use imagination and perception to determine the nature of the goods." *Champions*, 78 F.3d at 1117. Indeed, the evidence offered at trial supports the conclusion that the words "hair replacement system" are "used to commonly describe the relevant type of goods or services." *Id.* Numerous witnesses referred to the relevant type of goods as "hair replacements," "hair systems," or "hair replacement systems" (See e.g. I 26–27, 29, 62–63, 89–90, 93–94, 173, 188, 190; II 25, 29, 153–156, 160; III 7, 150; IV 25, 33). The exhibits offered into evidence also suggest that these terms are simple references to products or services

(See e.g. EX 3, 14, 30, B, F, Q, T, V–Y, NN, and MMM). At best, the registered words are merely descriptive and, thus, have no inherent distinctiveness. Moreover, the fact that the parties and other witnesses routinely used these terms in describing the goods of various manufacturers and sellers precludes a finding that the registered words have taken on any secondary meaning which might indicate source; accordingly, they have no acquired distinctiveness. In short, the registered words are a weak mark.

### (ii). The strength of the registered letters mark.

■ The registered letters, however, are neither generic nor descriptive. Instead, they appear to be fanciful in that they are "a combination of letters ... signifying nothing other than the product or service to which the mark has been assigned...." *Id.* Accordingly, the registered letters, particularly in light of their unique stylization, are inherently distinctive, and entitled to strong protection.[12] Defendants, nonetheless, suggest that the marks have been rendered weak by third party usage. Defendants suggestion is not supported by record evidence. They have not identified any significant third party usage of the letters "HRS" with the unique stylization registered by plaintiff.

### (iii). The strength of the registered logo mark.

■ Finally, the registered logo, which consists of the stylized letters "HRS" and the words "Hair Replacement Systems" displayed in a particular configuration, has sufficient strength to warrant trademark protection. Although the mark includes the words "Hair Replacement Systems," which are at best merely descriptive, plaintiff expressly disclaimed the exclusive right to use the words, apart from the way the words in combination with the stylized letters are presented in the logo. Put differently, plaintiff registered the stylization of the words in combination with the stylized letters. The letters are, at a minimum, suggestive; and,

---

12. At a minimum, the stylized letters "HRS" suggest to the particularly perceptive consumer that the product is a hair replacement system.

Such a suggestive mark is also sufficiently strong to warrant trademark protection.

the stylization of the letters and the words is, at a minimum, arbitrary. Accordingly, the logo is entitled to protection as a strong mark.

### b. The relatedness of the products or services offered.

"**The more closely related the plaintiff's and defendant's goods are, the more probable it is that buyers are likely to be misled or confused into believing that the goods are either from the same source, or even that the two products are one and the same.**"

*Chrysler Corp. v. Newfield Publications, Inc.*, 880 F.Supp. 504, 509 (E.D.Mich.1995).

■ The Sixth Circuit has acknowledged that there are three possible categories of relationship between plaintiff's and defendant's goods or services: "(1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners Group*, 931 F.2d at 1108; *see also Daddy's Junky Music*, at 282.

In the instant case, defendants argue that the products and services offered by the litigants are completely unrelated because National sells hair replacement services (and surgical hair transplant services) while plaintiff licenses hair replacement franchises. Defendants correctly note that plaintiff does not sell hair replacements nor does it sell products or services to consumers relating to hair replacements.

Despite this surface lack of relationship, the court concludes that the relationship factor favors plaintiff's position. Indeed, to conclude otherwise in this instance would afford no trademark protection to plaintiff as a licensor of the trademarks. There can be no question that plaintiff's licensees (the franchi-

sees) provide goods and services in direct competition with defendants.[13] Plaintiff, as their licensor, is entitled to rely upon that direct competition in establishing the relationship between the goods and services offered by the parties to the public. *See Chrysler Corp.*, 880 F.Supp. at 507, 509–10 (Court held that collectible cards licensed by plaintiffs, who were manufacturers of cars but mere licensors of various products displaying the names of the cars, were related to collectible cards produced by defendant).

### c. Similarity of the marks.

"**[Will] the mark '. . . be confusing to the public when singly presented.'**"

*Wynn Oil I*, 839 F.2d at 1187.

The Sixth Circuit set forth the standard for determining the similarity of the marks in *Homeowners*:

[I]n evaluating similarity of marks, " '[i]t is axiomatic in trademark law that "side-by-side" comparison is not the test.' " . . . Instead, the marks must be viewed in their entirety and in context. "[A] court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.' " . . . It is the overall impression of the mark, not an individual feature, that counts.

*Homeowners*, 931 F.2d at 1109 (citations omitted). "A proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of the conflicting marks." *Wynn Oil I*, 839 F.2d at 1188.

#### (i). The words.

■ The court concludes that the registered words, "Hair Replacement Systems," are similar to the words "national Hair Replacement Services." Although there are variances in pronunciation, appearance, and verbal translation, the marks are sufficiently similar that it may confuse consumers who

---

**13.** Indeed, it would be disingenuous for defendants to suggest that they do not directly compete with plaintiff's licensees in light of the fact that defendants operated as a licensee, although without a franchise agreement, until October 26, 1992, and then conducted the exact same business with a different name thereafter.

do not have both marks before them but who may have a "'general, vague, or even hazy, impression or recollection' of the other party's mark." *Wynn Oil I,* 839 F.2d at 1188. The court notes that this level of similarity may simply be a fact of life in the hair replacement marketplace. .

Based on the testimony offered by the parties and the exhibits, it is apparent that the marketplace is replete with persons and entities conducting business under assumed names which reflect the finite number of combinations of words which accurately represent the service and product provided. Put simply, a number of competitors in the industry conduct business under names which include two or more of the registered words. Perhaps for that reason, a number of plaintiff's competitors use stylized designs or unusual presentations of the words to differentiate themselves from the rest of the market. As to the words mark, plaintiff has not availed itself of this opportunity to differentiate itself from the rest of the market. Thus, although the marks are similar, there is a significant question as to whether consumers in this market would find the similarity confusing. *See Champions,* 78 F.3d at 1119 ("[S]imilarity alone does not compel a determination that marks are likely to be confused.").

### (ii). The letters.

■ The registered letters mark, "HRS" with its unique stylization, is similar to defendants' stylized "nHRS." As to these marks, it is the similarity in appearance which is most noticeable; however, there are also striking similarities in pronunciation and verbal translation. The tiny lower case "n" does little to distinguish the marks when they are viewed and also seems to disappear when the marks are verbally translated. It is readily apparent that, even considering the unusual marketplace, consumers may find defendants' marks confusingly similar to the registered letters, because of the significant similarity in stylization.

14. The letters in the registered logo are slightly different than in the registered letters mark, in

### (iii). The logos.

■ The registered logo is really nothing more than a combination of the stylized registered letters,[14] with the registered words; except, in the logo, the words also enjoy a unique stylization. The logo used by defendants include the letters "nHRS" with a stylization similar to plaintiff's and the words "national Hair Replacement Services" with a stylization dissimilar to plaintiff's. In the registered logo, the words are comprised of all capital letters, they are stacked on top of each other and set apart by lines, the word "HAIR" is printed using white lettering on a black background, and the word "SYSTEMS" is preceded and followed by small black boxes. In National's logo, only the first letters are capitalized, the type is conspicuously different, the words are arranged to be read left to right, and all of the words are black on a white background.

If the court were to reduce the logos to their respective components, it would find the letters components strikingly similar and the words components similar in content, perhaps unavoidably so, and dissimilar in stylization. The court is not at liberty, however, to so reduce the logos. In *Homeowners,* 931 F.2d at 1100, the Sixth Circuit stated that "the marks must be viewed in their **entirety** and in context … [i]t is the **overall impression** of the mark, not an individual feature that counts." *Id.* at 1109 (emphasis added); *see also Daddy's Junky Music,* at 283–84.

Reviewing the logos in their entirety and in context, the logos differ from the words marks and the letters marks in that they are not something that would likely be pronounced or verbally translated by consumers. Instead, they are something that consumers would probably only visualize; thus, appearance is of critical concern. Since the letters component is so similar and catches the eye first, and the words component is similar in content if not appearance, and does little to reduce the impression made by the letters component, the overall impression left by the logos leads the court to conclude that they are similar. The court notes, however, that

that the logo letters are white on a black background instead of black on a white background.

this is a close question.[15]

### (iv). Miscellaneous marks.

In addition to the words, letters, and logos identified above as marks used by defendants, defendants have used other marks which are the subject of plaintiff's complaint. Specifically, plaintiff claims that defendants have used the letters "HRS" in printed material (the brochures inadvertently sent out and the September 1994 Grand Rapids Press advertisements) and when answering the phones. Plaintiff also claims defendants have used the words "Hair Replacement Services" without the "national" (the September 1994 advertisements) and the words "Hair Replacement Systems" (the brochures, an exterior sign, and a cross reference in the Yellow Pages). The court finds that such marks are similar to plaintiff's registered marks.

### d. Evidence of actual confusion.

> "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."
>
> *Wynn Oil I*, 839 F.2d at 1188.

The Sixth Circuit has recognized that "evidence of actual confusion is difficult to produce...." *Wynn Oil I*, 839 F.2d at 1188. Despite the inherent difficulty in producing such evidence, plaintiff has provided evidence that consumers were actually confused as a result of defendants' use of the marks identified above.

Thomas Radecki, a client of defendants, testified that he carefully researched providers of hair replacement services (Radecki 8–15). Eventually, Mr. Radecki determined that he wanted to obtain a hair replacement from one of two entities that provided such services nationally: HRS or Hair Club for Men (Radecki 18–19). Mr. Radecki ultimately purchased his first hair replacement through defendants in 1993, based on his belief that defendants operated an HRS studio (Radecki 17, 20). Though Mr. Radecki's research regarding hair replacement may have taken place while the Grand Rap-

ids studio was legitimately an HRS studio (Radecki 11–12, 14–17), his actual purchase of the hair replacement and subsequent servicing of the hair replacement occurred after defendants began using the new marks (EX U; Radecki 19–27). Indeed, despite nearly twenty trips to the Grand Rapids studio (EX U), Mr. Radecki never realized he was dealing with an entity other than HRS until the operator of another HRS studio in another city informed him there was no HRS studio in Grand Rapids (Radecki 26–28).

In addition to Mr. Radecki, Terry Drillich, the operator of the HRS franchise in Ann Arbor, testified that several Grand Rapids studio customers came to his studio claiming to be customers of "HRS of Grand Rapids" (II 18, 28–31). Since the Ann Arbor franchise did not open until 1994 (II 29), it appears that these customers were confused as to the "HRS" affiliation status of the Grand Rapids studio after defendants began using their new marks in late 1992.

Finally, Hale himself testified that a customer came to the Grand Rapids studio expecting the studio to honor a coupon which appeared in a brochure with the letters "HRS" and the words "Hair Replacement Systems" (III 118). The brochures were sent out by the Grand Rapids studio after the break with plaintiff (III 118).

### e. Marketing channels used.

> "The greater degree in which the parties use the same or similar marketing channels, the greater is the likelihood of confusion."
>
> *Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 514 (E.D.Mich.1994)

Under this factor, the court must consider "how and to whom the respective goods or services of the parties are sold." *Homeowners*, 931 F.2d at 1110. Where there is overlap "in the media used to communicate with [the parties'] respective target markets ...," *Homeowners*, 931 F.2d at 1111, or "[w]here the parties' customers are similar

---

**15.** For a compelling example of a logo which is even more similar to plaintiff's registered logo, see the Yellow Pages advertisement of Dayton, Ohio's "Hair Replacement Clinic." (Exhibit R, p. 39).

...," *Chrysler Corp.,* 880 F.Supp. at 510, confusion is more likely.

Given the identity between the goods and services offered by the parties, there can be little question that they are trying to reach the same potential customers. Moreover, the parties use the same media to reach these customers. By way of example, Terry Drillich testified that the Ann Arbor HRS franchise, using materials supplied by plaintiff advertised through television, radio and newspapers, as well as the Yellow Pages (11 13–14). The trial exhibits reveal that defendants used all of these media, with the exception of radio (EX 20, 22, 23, X–Z).

### f. The likely degree of purchaser care and sophistication.

**"In general, the less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion."**

*Wynn Oil II,* 943 F.2d at 602.

■ In *Homeowners Group,* 931 F.2d at 1100, the Sixth Circuit provided a detailed explanation of this factor:

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. **Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.**

*Id.* at 1111 (emphasis added); *see also Daddy's Junky Music,* at 285–86.

In this case, the goods and services are extremely personal as well as expensive and unusual. Hale testified that a hair replacement system might cost close to two thousand dollars (III 100, 139). Once attached, the system must be styled every few months and the attachments tightened (Radecki 25). Moreover, the system has to be periodically reconditioned at the factory, and, within a few years, replaced (Radecki 19–20). Indeed, to avoid any interruption in the benefit of hair replacement as a result of reconditioning, it is recommended that a customer purchase two systems (Radecki 28).

Put simply, the expense of and recurring care for a hair replacement system is a significant burden and suggests that consumers would exercise a high degree of care in their purchases. Though this factor definitely weighs in favor of defendants, the court notes that this high degree of care does not preclude a finding of likely confusion. *See Homeowners Group,* 931 F.2d at 1111 ("[T]he expertise of purchasers does not necessarily preclude a finding that confusion is likely...."); *Champions,* 78 F.3d at 1121 ("'[T]he sophistication of buyers cannot be relied on to prevent confusion'...."); *Daddy's Junky Music,* at 286 ("[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the [goods] that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party."). Indeed, the fact that Mr. Radecki was confused despite his care suggests a strong likelihood of confusion even where care is taken.

### g. Defendants' intent in selecting their marks.

**"Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion."**

*Wynn Oil II,* 943 F.2d at 602.

■ It would certainly be unusual for a defendant to acknowledge an intent which might subject him to a potential treble damage remedy. It is undoubtedly for that reason that courts have routinely held "[an] intent to infringe may be shown by circumstantial evidence." *Wynn Oil I,* 943 F.2d at 603 (citing cases); *see also Champions,* 78 F.3d at 1121. One such circumstance which might reveal intent is mere knowledge of another's prior use of the mark. *See Wynn Oil II,* 943 F.2d at 603 ("[U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement.... Moreover, where 'trade-marks [have] been ... long in use and ... widely

advertised, it is presumed that [the infringer] had knowledge of [the marks].'"); *Daddy's Junky Music,* at 286 ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying.) *Aero–Motive Co.,* 922 F.Supp. at 44.

In this case, defendants simply cannot deny longstanding knowledge of plaintiff's use of the marks. Hale participated in the advertising cooperative which initially used the marks, he also used the marks for years as a principal of plaintiff's licensees in Nashville, Grand Rapids and Florida. To suggest that defendants selected their marks with no knowledge of plaintiff's marks would be absurd. James Denny, the graphic artist who designed defendants' new marks, testified that Hale instructed him to retain the letters "HRS" in the new logo. (Denny 15; Denny Ex. 4). The court infers from defendants' intimate knowledge of plaintiff's marks, and its selection of similar marks, that defendants intended to use marks which were as similar as permitted to plaintiff's marks.

### h. Likelihood of expansion of the product lines using the mark.

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing."

*Homeowners,* 931 F.2d at 1112

Where the parties are already direct competitors with regard to the products and services they offer, as are plaintiff and defendants here (*see* § III.B.2.b. *infra*), the possibility of expansion to bring about direct competition is already a reality. *See Chrysler Corp.,* 880 F.Supp. at 511; *Blockbuster Entertainment Group,* 869 F.Supp. at 515; *Countrywide Funding Corp. v. Countrywide Fin. Corp.,* 879 F.Supp. 771, 773 n. 2 (W.D.Mich.1994). Nonetheless, to the extent this factor includes geographic expansion, *see Homeowners Group,* 931 F.2d at 1112 ("[P]lans for geographic expansion by one or both parties may be relevant."); *Champions,* 78 F.3d at 1121 ("The inquiry is not limited simply to geographic expansion....") *Dad-*dy's *Junky Music,* at 287–88, the court notes that plaintiff has advertised for a new franchisee in the Grand Rapids area.

### 3. Summary regarding likelihood of confusion.

Taking into account the "foundational facts" generated by the eight factor test, *Champions,* 78 F.3d at 1116, the court concludes that defendants' use of its letters mark, "nHRS," and their logo, as well as their intermittent use of "HRS" and "Hair Replacement Systems" is likely to confuse consumers. On the other hand, the court concludes that confusion is not likely to result from defendants' use of the words "national Hair Replacement Services."

### a. Marks likely to cause confusion.

The court's findings on the eight factors as to the letters marks may be summarized as follows:

1. Plaintiff's registered letters mark is a strong mark, particularly in light of its unique stylization.

2. The goods and services sold by plaintiff's licensees are the same goods and services sold by defendants; however, defendants sell hair transplant services which neither plaintiff nor its licensees sell.

3. Defendants' "nHRS" mark is similar, with regard to the letters used and their stylization, to plaintiff's registered letters mark.

4. There is evidence of actual confusion.

5. Defendants use the same marketing channels as plaintiff or its licensees to reach the same consumers that plaintiff or its licensees are trying to reach.

6. Given the expense and highly personal nature of the goods and services sold by plaintiff, its licensees, and defendants, purchasers are likely to exercise a high degree of care when purchasing the goods or services.

7. The defendants were intimately familiar with plaintiff's marks when they adopted their own; thus, the court infers they intended to benefit from the goodwill plaintiff had established in its marks.

8. Plaintiff has attempted to reestablish its name in the Grand Rapids area.

With the exception of the court's finding as to the sixth factor, these findings strongly support the conclusion that "relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way," *Homeowners Group*, 931 F.2d at 1107, creating a likelihood of confusion. The court's findings as to the logo compel the same conclusion as to that mark.

■ A finding of likely confusion is also supported by the nature of the relationship between plaintiff and the Grand Rapids studio operated by defendants. Defendants are former franchisees of plaintiff and former licensees of plaintiff's marks. Where former franchisees or licensees continue to use marks or confusingly similar marks after the license is terminated, consumer confusion is nearly inevitable. *See e.g. Two Men and a Truck/Int'l, Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 1995 WL 549278 (W.D.Mich. July 24, 1995); *Little Caesar Enterprises, Inc. v. R–J–L Foods, Inc.*, 796 F.Supp. 1026 (E.D.Mich.1992); *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir.1975); *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431 (7th Cir.1989); *Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214 (8th Cir.1988); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir.1988); *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir.1983). Here, the problem is further accentuated by the fact that defendants also remained in the same location where they had been as a franchise. The context of this relationship plays a critical role in the court's findings as to defendants' intent as well as its conclusion with regard to the likelihood of confusion.

### b. Marks not likely to cause confusion.

■ The court's findings of the foundational facts as to the words mark are sufficiently different from its findings as to the other marks to compel the opposite conclusion: defendants' use of its words and mark is not likely to confuse consumers. As to the words mark, the finding that the mark is

weak and entitled to little protection leads to this conclusion. It appears to be a simple fact of life in the hair replacement market that businesses will use two or more of the words "hair," "replacement" and "system" as a trade name. These are merely descriptive terms which carry no "source-indicating" secondary meaning. To grant protection as to these words would be to ignore the reality of this marketplace.

### 4. Parties liable for infringement and unfair competition.

■ Plaintiff alleges that Hale is individually liable for the trademark infringement, along with National, under two theories: piercing the corporate veil and direct involvement in the infringing activity. The court rejects plaintiff's veil piercing claim. Although Hale and his wife are the sole shareholders of National, plaintiff has failed to establish any meaningful or regular disregard for corporate formalities which might render National the Hales' mere instrumentality for avoiding individual liability for their alleged illegal conduct. *See Soloman v. Western Hills Development Co.*, 110 Mich. App. 257, 312 N.W.2d 428 (1981). Indeed, if plaintiff were to prevail on its argument on these facts, any time a closely held corporation were found liable for trademark infringement, its shareholders would be liable as well. The Michigan courts provide greater protection for the separate existence of a corporation. *Seasword v. Hilti, Inc.*, 449 Mich. 542, 537 N.W.2d 221 (1995).

■ Plaintiff also argues that Hale is liable for his direct involvement in the infringing activity, rather than derivatively as a shareholder of National. "Employees of corporations are not shielded from individual liability under the Lanham Act solely because their actions were taken within the scope of their employment." *Two Men and a Truck*, 1995 WL 549278 at *4 (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3rd Cir.1978)).[16] Put simply, a corporate

**16.** *See also Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161 (11th Cir.1994); *Metromedia Steakhouses Co., L.P. v. Resco Management, Inc.*, 168 B.R. 483 (D.N.H.1994) (citing cases); *Contemporary Restaurant Concepts, Ltd. v. Las Tapas–Jacksonville, Inc.*, 753 F.Supp. 1560 (M.D.Fla. 1991); *Brandywine Mushroom Co. v. Hockessin Mushroom Products, Inc.*, 682 F.Supp. 1307

officer's active participation in infringing activity is sufficient to subject him or her to joint and several liability for trademark infringement with the corporation. There can be no doubt that Hale actively participated in the selection and use of the infringing marks; accordingly, he is jointly and severally liable with National.

### C. Remedies.

The remedies for violations of 15 U.S.C. §§ 1114(a) and 1125(a) are provided in 15 U.S.C. § 1116 (injunctive relief) and 1117 (damages). Plaintiff seeks both types of relief.[17]

#### 1. Injunctive relief.

Section 34 of the Lanham Act provides that the federal district courts have the power to grant injunctions, according to the principles of equity, to prevent violation of any right of a registrant and to prevent a violation under 15 U.S.C. § 1125(a). The principles of equity which a court must consider in deciding a request for injunctive relief are analyzed below. In this instance, those principles favor the grant of an injunction against defendants' continued use of the "HRS," "nHRS," or any other marks confusingly similar to plaintiff's registered letters mark; accordingly, the court will so enjoin defendants' conduct.

##### a. Irreparable harm.

In *Wynn Oil II*, 943 F.2d at 595, the Sixth Circuit analyzed the "irreparable harm" requirement in the context of a trademark infringement action.

> In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm. [citations omitted] ... [A] 'finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears.' [citations omitted]. The irreparable injury flows 'both from the potential difficulty of proof of plain-

tiff's damages, and also from the impairment of intangible values ...' [citations omitted].

*Id.* at 608. The court accepts plaintiff's proof of a likelihood of confusion as proof of irreparable injury.

##### b. Balance of harms.

In exercising its equitable powers, a court must avoid doing more harm than good. Accordingly, an injunction will not issue if its issuance will cause a greater risk of harm than would be caused if the injunction did not issue. *Aero–Motive Co.* 922 F.Supp. at 46; *Blockbuster Entertainment Group*, 869 F.Supp. at 516. Here, defendants have not alleged any harm which might accrue upon issuance of the requested injunction which outweighs the irreparable harm which plaintiff has proven. Because defendants have used the offending marks for less than five years, and their customers are likely to exercise care in their product selection, the court does not believe that any changes compelled by the injunction will impose an undue hardship on defendants. Indeed, defendants have suggested that injunctive relief would be an appropriate remedy if the court found infringement.

##### c. Public interest.

The parties have an opportunity to convince this court of the relative harms they may suffer if the injunctive relief requested is granted or denied. The public, however, does not have this opportunity. Accordingly, a court should not exercise its equitable powers to grant injunctive relief until it has considered the impact of that relief on the public interest. Here, the injunctive relief will promote the public interest in that it will "prevent consumer confusion," an interest the trademark laws were designed to protect. *Id.*

(D.Del.1988); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir.1987); *Steak & Brew, Inc. v. Makris*, 177 U.S.P.Q. 412, 1973 WL 19835 (D.Conn.1973); *Polo Fashions, Inc. v. BDB, Inc.*, 223 U.S.P.Q. 43, 1983 WL 44362 (D.S.C.1983); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899 (E.D.N.Y.1988).

17. The relief granted to remedy defendants' violations of the Lanham Act is identical to any relief the court might grant to remedy defendants' violations of the common law. Accordingly, remedies for common law violations will not be discussed separately.

## 2. Damages.

Plaintiff also requests, and is entitled to, damages. The Lanham Act provides:

. When a violation of any right of the registrant of a mark registered in the [USPTO], or a violation under [15 U.S.C. § 1125(a)] shall have been established ... the plaintiff shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a). Each of these elements is analyzed below.

### a. Defendants' profits.

Pursuant to the Lanham Act, plaintiff need show only defendant's sales in establishing "profits" damages; once sales have been shown, it is defendant's burden to demonstrate any costs of sales which should be deducted to compute defendant's profits. 15 U.S.C. § 1117(a). Here, plaintiff has demonstrated total revenues in the amount of $1,829,716.00. Defendants seek to reduce this amount in two ways: first, defendants contend that all revenues and expenses relating to the surgical hair transplant business should be deducted because such revenues

and expenses are wholly unrelated to the products and services which might be covered by plaintiff's marks; and second, defendants contend that the costs associated with the hair replacement business should be deducted.

■ The court agrees that revenues from the surgical hair transplant segment of defendant's business are not properly included in the "profits" analysis. Such revenues are unrelated to that aspect of defendant's business which might infringe plaintiff's marks. The court also agrees that costs associated with the hair replacement business should be deducted. Defendants and plaintiff accomplish their reductions of total corporate revenues, for purposes of determining hair replacement profits, using different methods. Not surprisingly, defendants' method yields a conclusion that the hair replacement business never generated a profit, while plaintiff's method demonstrates that the hair replacement business earned profits exceeding a quarter of a million dollars during the relevant period.[18]

### (i). Defendants' method.

For each year in the relevant period, defendants start with the net income of the corporation as reflected on the corporate tax returns. Defendants subtract from that figure the net income of the hair transplant clinic (the "clinic") business to arrive at an unadjusted net income for the hair replacement business. The method used to calculate clinic net income, however, is different for each year.

For 1993, the corporate income tax return initially filed failed to include certain transactions relating to the clinic. After the return was filed, defendants' accountant discovered a bank account with a year end balance

**18.** The relevant period, according to the parties' calculations includes the full calendar years of 1993, 1994, and 1995. The court notes that based upon the thirty day franchise termination notice sent during October of 1992, the relevant period might also include a few days in November and all of December, 1992. On the other end, inclusion of the entire year 1995, as opposed to part of it, may be inappropriate. Neither party established precisely when defendants

ceased using the infringing marks. The closing arguments of counsel suggested that defendants stopped using the offending marks near the end of 1995. Presumably for the sake of convenience and ease of calculation, the parties have ignored any profits accruing during 1992 and included all profits accruing during 1995. For the same reasons, the court will confine its analysis to the years 1993–1995, inclusive.

which had not been included in the return. Defendants suggest that the account related solely to the clinic and, therefore, the year end balance constitutes clinic net income for 1993. Whether or not the defendants' suggestion is accurate, based on transactions in the account, the 1993 corporate return was amended to reflect an additional $38,990.00 in income.

The court rejects defendants' contention that the $38,990.00 represents clinic net income for 1993. There is no testimony or documentary evidence in the record which adequately supports the inference that the additional money in the account represents clinic, and only clinic, revenues less clinic, and only clinic, expenses. Based on the record, it is entirely possible that clinic expenses or revenues were reflected in other accounts and, thus, already included in the 1993 corporate tax return initially filed. Moreover, there is nothing in the record which would preclude a finding that the undiscovered account included transactions relating to the hair replacement business. Although addition of the $38,990.00 to 1993 total corporate net income for tax purposes is appropriate, the court is not convinced that this figure represents *clinic* revenues less *clinic* expenses and thus, *clinic* net income. Accordingly, the court rejects defendants' conclusion as to 1993 profits of the hair replacement business.

For 1994, defendants provide a more detailed accounting of clinic revenues and clinic expenses. Based on an analysis of checks reflecting clinic revenues and clinic expenses, defendants conclude that clinic net income for 1994 was $89,209.50. Plaintiff challenges defendants' allocation of expenses between the clinic and the hair replacement business, suggesting that the allocation yields illogical results. Plaintiff had every opportunity to depose and to elicit courtroom testimony from Don Hale and his wife Dixie, the corporate defendant's bookkeeper, regarding the allocation, and failed to avail itself of the opportunity; thus, there is no record to support a challenge to the Hales' credibility in making the allocation. Moreover, the court finds that the allocation is not inherently illogical.

For 1995, defendants again provide a detailed accounting of clinic revenues, but they do not provide a detailed accounting of expenses. Instead, they compute the ratio of 1994 clinic net income to 1994 clinic revenue and apply it to 1995 clinic revenue to provide an estimate of 1995 clinic net income: $123,884.00. Plaintiff again challenges this method based on what it contends are illogical results with regard to allocation of expenses as well as the inconsistency between the projection and unexplained substantial fluctuations in actual expense between the years 1994 and 1995.

With their clinic net income numbers in hand, defendants proceed to subtract clinic net income from total corporate net income to leave hair replacement net income. Defendants then propose adjusting that number by adding back defendant Hale's salary for each year and subtracting a reasonable salary to yield a final net income figure for the hair replacement business. Defendants contend that this final adjustment is necessary because funds paid to the owner and officer of a closely held corporation might represent either compensation for services rendered, or a return or loss on investment, or some combination thereof.

Although the court has rejected certain portions of defendants' method, the method yields a total hair replacement "profit" of $(29,503.00) and can be summarized in its entirety as follows:

| Year | | 1993 | | 1994 | | 1995 |
|---|---|---|---|---|---|---|
| Aggregate Corporate Net Income | | $28,103.00 | | $92,002.00 | | $104,773.00 |
| Less Clinic Net Income | − | 38,990.00 | − | 89,209.00 | − | 123,884.00 |
| Hair Replacement Net Income | | $(10,887.00) | | $2,793.00 | | $(19,111.00) |
| Plus Hale's Actual Compensation | + | 46,880.00 | + | 80,900.00 | + | 61,800.00 |

| | | | |
|---|---|---|---|
| Less Reasonable Compensation | − 61,1442 | − 63,900.00 | − 66,456.00 |
| Adjusted Hair Replacement Net Income | $(25,529.00) | $19,793.00 | $(23,767.00) |

### (ii). Plaintiff's method.

Plaintiff's method more closely tracks the respective burdens of proof created by the statute. Rather than starting with aggregate corporate net income from the tax returns and then working backwards, plaintiff begins with total corporate revenues. Plaintiff subtracts from total corporate revenues all revenues attributable to the clinic to provide total hair replacement revenues. Plaintiff subtracts from these revenues a projection of hair replacement expenses to reach a hair replacement net income number.

Plaintiff's projection of hair replacement expenses is based on calendar year 1992, the corporation's first year of existence and the only year unsullied by operation of the clinic. For each category of expense reflected on the 1992 corporate tax return, plaintiff reflects the expense as a percentage of revenue. Plaintiff then applies the resulting percentages to hair replacement revenues for 1993, 1994, and 1995, to provide a projection of total expense for each year. The only exception to the percentage method is plaintiff's use of Hale's actual compensation in computing total hair replacement expenses.[19]

Plaintiff also suggests that an adjustment to net income relating to Hale's compensation would be appropriate. Specifically, plaintiff contends that Hale should not be permitted to profit in any way from the infringement. Accordingly, plaintiff proposes adding all of Hale's compensation to hair replacement net income to reach a final net income damage amount.

Plaintiff's method yields a total hair replacement "profit" of $251,373.00:

| Year | 1993 | 1994 | 1995 |
|---|---|---|---|
| Aggregate Corporate Revenues | $475,915.00 | $646,685.00 | $707,116.00 |
| Less Clinic Revenues | − 0.00 [20] | − 197,802.00 | − 277,520.00 |
| Hair Replacement Revenues | $475,915.00 | $448,883.00 | $429,596.00 |
| Less Hair Replacement Expenses | − 434,387.00 | − 446,470.00 | − 411,664.00 |
| Hair Replacement Net Income | $41,528.00 | $2,413.00 | $17,932.00 |
| Plus Hale's Compensation | + 46,800.00 | + $80,900.00 | + $61,800.00 |
| Adjusted Hair Replacement Net Income | $88,328.00 | $83.313.00 | $79.732.00 |

### (iii). The court's method.

The difficulty in determining the amount of profits that were earned in the hair replacement business is the product of defendant National's failure to allocate expenses as they were incurred between the clinic and the hair replacement business.[21] The parties were compelled to overcome this difficulty with estimates and projections and the court will do so as well.

The court has rejected defendants' calculation of the clinic's net income for 1993. Once

19. This exception operates to plaintiff's detriment in the amount of approximately $8,000.00 in computing total hair replacement net income for the three years.

20. The 1993 revenues were taken from the 1993 tax return initially filed. For that reason, no clinic revenues are included in the first instance and there is no need to subtract them.

21. This should not be taken as a criticism of National. Although allocating expenses between the two businesses might provide useful information for management, it is certainly not necessary for any other purpose, including taxation.

the clinic net income is rejected, the hair replacement net income for that year must also be rejected. Accordingly, the court preliminarily adopts the 1993 hair replacement net income figure proposed by plaintiff of $41,528.00, before the adjustment relating to Hale's compensation. For 1994, the defendants' calculation of clinic net income is based on actual expense and revenue figures, even though the "actual" expense numbers include some perhaps subjective allocations between the clinic and hair replacement businesses. The court finds that defendant's calculation using the actual revenues and expenses is preferable to plaintiff's projection method and preliminarily adopts the 1994 hair replacement net income figure proposed by defendants of $2,793.00, before the adjustment relating to Hale's compensation.[22]

For 1995, both parties base their proposed net income figures solely on projections. Defendants project 1995 clinic expenses based or actual expense numbers from 1994. Plaintiff projects 1995 hair replacement expenses based on actual expense numbers from 1992. Plaintiff's projection method is bolstered by the 1994 results and by the fact that it is projecting the expenses of an established business in existence for several years. Although 1992 was the first year of National's corporate existence, the business had been operated for several years prior to 1992 in the same location with the same management. It is not unreasonable to conclude that the hair replacement business achieved some consistency in the amount of its expenses in relationship to revenues over the years. Defendants' projection, on the other hand, is bolstered by a closer proximity in time between the base year and the projected year.

These factors are simply too insubstantial to promote one of the methods over the other. Keeping in mind the purpose of the "profits" damage remedy, to ensure that the infringer is not unjustly enriched by its im-

proper conduct and is appropriately deterred from further infringement, *Wynn Oil II*, 943 F.2d at 606–07, and keeping in mind that it is defendants' burden to show any deductions from gross revenues, *Id.* at 606, the court preliminarily adopts plaintiff's projected net income for 1995, before the adjustment relating to Hale's compensation, $17,932.00.

The court's adoption of the net income numbers for each of the three years is "preliminary" because the court must also resolve the parties' proposed adjustments to net income based on Hale's compensation. The court rejects defendants' proposal to substitute a "reasonable" salary for Hale in place of his actual compensation. The court has reviewed the compensation Hale received during the three years and concludes that it was not unreasonable; thus, the final adjustment proposed by defendants is unnecessary.

■■■ The court also rejects the final adjustment proposed by plaintiff. Several courts have concluded that the officer of an infringing company is entitled to a reasonable salary which must be taken into account in computing profits. *See Aladdin Mfg. Co. v. Mantle Lamp Co. of America*, 116 F.2d 708, 713 (7th Cir.1941); *Wolfe v. National Lead Co.*, 156 F.Supp. 883, 892 (N.D.Cal. 1957); *John B. Stetson Co. v. Stephen L. Stetson Co.*, 58 F.Supp. 586, 592–93 (S.D.N.Y. 1944). The court concludes that the compensation received by Hale, though not a set salary, constituted a reasonable salary and not a distribution of profits. Accordingly, it would be inappropriate to add back Hale's compensation in computing "profits" damages.

■■■ Although the court rejects the adjustments relating to Hale's compensation proposed by the parties, an adjustment is warranted. Both parties charged Hale's entire compensation against hair replacement revenues. The court finds that at least some of Hale's compensation is properly charged

---

22. It is interesting to note that plaintiff's projection method for 1994 yields a result which is virtually identical to that provided by defendants' analysis of actual clinic revenues and expenses for 1994. A comparison of the 1994 corporate tax return with the expenses projected by plaintiff reveals that plaintiff's method yields results which are necessarily incorrect on a line item by line item basis; yet, the net incomes proposed by the parties are only a few hundred dollars apart. Thus, defendants' proposed net income figure appears to validate plaintiff's method of calculation.

against clinic revenues. Because the record does not reveal that Hale expended more of his efforts on behalf of the clinic than on behalf of the hair replacement side of the business, or vice–versa, an even split would be appropriate. This allocation has the effect of increasing hair replacement net income for each year by one-half of Hale's compensation for that year. Accordingly, the hair replacement profits for 1993 total $64,928.00, for 1994 total $43,243.00, and for 1995 total $48,832.00. In sum, the court finds that "profits" damages total $157,003.00 for the relevant period. The court will not adjust this amount either up or down because it finds this amount to be neither inadequate nor excessive.[23]

### b. Plaintiff's actual damages.

■ The profits of an infringing defendant are not intended to be an accurate measure of the damages suffered by plaintiff. That is particularly true where, as here, the defendant and plaintiff do not directly compete, even though plaintiff's licensees and defendant may directly compete. Put differently, it is not at all accurate to say that the profits accruing to defendant by virtue of its infringing activity would have otherwise accrued to plaintiff, because plaintiff does not sell hair replacement products or services. Indeed, the best measure of plaintiff's actual losses are the franchise fees lost by virtue of defendant's effective operation of an "HRS" franchise without payment of any fees. Accordingly, the court finds that the franchise fees which would have been due for the period of infringement are an appropriate measure of plaintiff's actual damages. Such franchise fees would include a $10,600.00 initial fee and $600.00 per month in advertising and royalty fees for each month defendant used plaintiff's marks or other marks which were confusingly similar.[24] These damages total $32,800.00.

Though it is within the court's discretion to enhance these damages, any such enhancement must be consistent with equity and the Act's mandate that damage awards be compensatory and not punitive. 15 U.S.C. § 1117(a). In light of the other remedies provided, the court considers further enhancement of plaintiff's actual damages to be punitive and not compensatory. Accordingly, the court will not enhance plaintiff's actual damages.

### 3. Costs and attorney fees.

■ Plaintiff, by statute, is entitled to its costs. Moreover, to the extent plaintiff establishes that this is an "exceptional case," the statute also permits an award of attorney fees. 15 U.S.C. § 1117(a). The Sixth Circuit has described exceptional cases as "those cases in which the infringement was 'malicious, willful, fraudulent, or deliberate.'" *Wynn Oil II*, 943 F.2d at 607; *see also Hindu Incense v. Meadows*, 692 F.2d 1048, 1051–52 (6th Cir.1982); *Countrywide Funding Corp.*, 879 F.Supp. at 774; *Aero–Motive Co.*, 922 F.Supp. at 47–48. If there is the slightest doubt as to defendant's deliberate, willful intent to infringe, the case is not exceptional. *Hindu Incense*, 692 F.2d at 1052, citing *O'Brien International, Inc. v. Mitch*, 209 U.S.P.Q. 212, 221, 1980 WL 30251 (N.D.Cal.1980); *see also Countrywide Funding Corp.*, 879 F.Supp. at 774.

■ Here, there is no evidence that the infringement was fraudulent or malicious. Although the court has inferred from Hale's

---

**23.** Plaintiff contends this court must treble defendants' profits when it awards damages based on 15 U.S.C. § 1117(b). Plaintiff's contention is based on the faulty premise that defendant's infringing marks constituted counterfeit marks under the Lanham Act. A counterfeit mark is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The court has not found that defendants' marks were counterfeit; it has found that they were confusingly similar colorable imitations, which is not the same thing as counterfeit under the Act. *See* 15 U.S.C. § 1114(1)(a). Though it is not mandatory, it is within the court's discretion to adjust a "profits" award, up or down, without limitation. 15 U.S.C. § 1117(a). The court chooses not to exercise that discretion.

**24.** Under a typical franchise agreement defendant may also have been liable for quota fees if it failed to order a sufficient number of hair replacements; however, there is no evidence in the record which would permit the court to conclude that such fees would be due or, if so, in what amount. Accordingly, quota fees are not included in the damage calculation.

intimate familiarity with plaintiff's registered marks that defendants intended to use marks similar to plaintiffs, that level of intent appears to fall short of the deliberate or willful infringement necessary to make this claim exceptional. Indeed, there is evidence that Hale attempted to adopt similar marks which would not infringe plaintiff's marks. The graphic artist who prepared the logo testified that he was to design a logo which was different from plaintiff's marks and would not infringe those marks (Denny 8–13, Denny Ex. 4). The artist believed that if he changed plaintiff's marks "at least 10 percent" the new marks would be acceptable. (Denny 13). The artist was plainly wrong, however, the overall record suggests that defendants attempted to avoid infringing. Under these circumstances, the infringement is not sufficiently deliberate or willful to render this case an exceptional one. Accordingly, the court cannot award plaintiff its attorney fees.

## IV. Conclusion.

As to Count I of plaintiff's complaint, regarding enforcement of the franchise agreement, the court concludes that defendants are not liable. As to the remaining counts of plaintiff's complaint, the court concludes that defendants Hale and National are jointly and severally liable for infringing on plaintiff's registered letters and logo trademarks. Judgment shall be entered in plaintiff's favor and against defendants. The judgment shall include an award of defendants' profits in the amount of $157,003.00, and actual damages to plaintiff in the amount of $32,800.00 and costs. The judgment shall also include an injunction against defendants' use of any marks that are confusingly similar to plaintiff's registered letters mark and/or registered logo mark.